**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| OMID ROKNI | ) | |
| 9706 Days Farm Road | ) | |
| Vienna, Virginia 22182 | ) | |
| | ) | |
| MIKE ROKNI | ) | |
| 1316 Vincent Place | ) | |
| McLean, Virginia 22102 | ) | Civil Action No. _____ |
| | ) | |
| AMINI ROKNI | ) | COMPLAINT FOR DAMAGES |
| 9706 Days Farm Road | ) | DEMAND FOR JURY TRIAL |
| Vienna, Virginia 22182 | ) | |
| | ) | |
| SHADI SABA, | ) | |
| 47640 Paulson Square | ) | |
| Sterling, Virginia 20165 | ) | |
| | ) | |
| POOPAK TAATI | ) | |
| 825 Wayburn Terrace #223 | ) | |
| Los Angeles, CA 90024 | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| PNH UNION SQUARE, LLC. | ) | |
| c/o Corporation Service Company | ) | |
| 1090 Vermont Street | ) | |
| Washington, DC 20005 | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

**COMPLAINT**
**I – JURISDICTION**

1.     This is an action of a civil nature in which the District Courts of the United States

have been given original jurisdiction pursuant to 28 U.S.C. § 1331 because a federal question

1

exists under Defendant's violation of the Federal Interstate Land Sales Act (ILSA) 15 U.S.C. §1701 *et seq.*

2.      "Plaintiffs", Omid Rokni, Mike Rokni, Amini Rokni, Shadi Saba are residents of Fairfax County, Virginia; Poopak Taati is a resident of Los Angeles County, California. Defendant PNH Union Square LLC is a Delaware Limited Liability Company registered to do business in the District of Columbia as of November 16, 2004.

3.      This is an action of a civil nature in which the District Courts of the United States have been given original jurisdiction pursuant to 28 U.S.C. § 1332 (a)(1) because of the amount in controversy exceeds the sum of $75,000.00, exclusive of interest and costs, and complete diversity of citizenship exists between the Plaintiffs and PNH Union Square, LLC as shown above.


## II- PARTIES

4.      Omid Rokni entered into a unit purchase agreement (the "Agreement") with the Defendant on or about May 11, 2005 to acquire a condominium, to be built, located at 2125 14th Street, N.W. Washington, D.C. 20009; Unit number 313.

5.      Mike Rokni entered into a unit purchase agreement (the "Agreement") with the Defendant on or about May 11, 2005 to acquire a condominium, to be built, located at 2125 14th Street, N.W. Washington, D.C. 20009; Unit number 413.

6.      Amin Rokni entered into a unit purchase agreement (the "Agreement") with the Defendant on or about May 11, 2005 to acquire a condominium, to be built, located at 2125 14th Street, N.W. Washington, D.C. 20009; Unit number 306.

7.    Shadi Saba entered into a unit purchase agreement (the "Agreement") with the Defendant on or about November 22, 2005 to acquire a condominium, to be built, located at 2125 14th Street, N.W. Washington, D.C. 20009; Unit number 207.

8.    Poopak Taati entered into a unit purchase agreement (the "Agreement") with the Defendant on or about November 6, 2005 to acquire a condominium, to be built, located at 2125 14th Street, N.W. Washington, D.C. 20009; Unit number 223.

9.    All Plaintiffs' Agreements are similar in every respect with the only exceptions being, the unit number, unit price and deposit tendered.  Collectively, all Plaintiffs' Agreements referred to as the "Agreement." **Exhibit 1**

10.    For judicial expediency and as a proper matter of consolidation all Plaintiffs' actions are similar in nature as against the same Defendant.

## III- FACTS

11.    In consideration of the Agreement the Plaintiffs tendered deposits to the Defendant as indicated below:

| | | |
|---|---|---|
| Omid Rokni | Forty three thousand six hundred seventy-three dollars | ($43,673.00) |
| Mike Rokni | Thirty one thousand nine hundred eight-three dollars | ($31,983.00) |
| Amini Rokni | Thirty two thousand two hundred sixty-three dollars | ($32,263.00) |
| Shadi Saba | Twenty-two thousand six hundred forty-five dollars | ($22,645.00) |
| Poopak Taati | Twenty-four thousand nine hundred ninety-five dollars | ($24,995.00) |
| | Total Deposits | $155,559.00 |

12.    All units are "to be built units."  All Plaintiffs were referred to Defendant's web site for a description of the unit they were purchasing.

13.     Demand was made upon Defendant for to return the Plaintiffs' deposit plus statutory interest pursuant to the terms of the Agreement and the points presented herein.  The Defendant has refused and continues to refuse, without cause, to refund the Plaintiffs' deposit.

## IV - FIRST CAUSE OF ACTION
## VIOLATION OF DISTRICT OF  COLUMBIA CONSUMER PROTECTION ACT

14.     Plaintiff realleges and restates paragraphs 1 through 12 inclusive as if fully stated herein.

15.     The Plaintiffs did make a demand for a full refund pursuant to the D.C. Condominium Act §42-1904.02.  The Defendant has not complied.

16.     The District of Columbia Consumer Protection Act (DCCPA) at § 28-3904 (a) and (b) makes it unlawful to misrepresent any material fact which would have a tendency to mislead.

17.     The Defendant's web site rendering of the property the Plaintiffs were purchasing was intentionally vague and ambiguous, not showing bedroom or den layout or configurations, so as to mislead the Plaintiffs into believing they were receiving something they did not expect when they were required to do their "walk through."

18.     The Defendant has engaged in the practice of selective, preferential and discriminatory treatment with respect to the Roknis, who are real estate brokers and agents.  The Defendant has given cooperative broker fees to similar purchasers of units within the same building but has specifically precluded these Plaintiffs from broker cooperation consideration.  Such actions violate the DCCPA § 28-3904 (j).

4

19.    The Defendant has limited the Plaintiffs' right in inspect the property and "mandated" if Plaintiffs do not close (Exhibit 1 §24.2) they forfeit their deposit, despite how many problems the unit may have at the time of the Defendant's Demand.

20.    The Defendant provided "no change" Agreements with title being vested in non purchaser's name.

21.    The Defendant has preferentially offered one year prepaid condominium association fees to other purchasers of units within the same building but has specifically precluded the Plaintiffs from prepaid condominium association fees.  Such actions violate the DCCPA § 28-3904 (j).

22.    The Defendant has mandated the Plaintiffs forfeit their deposits without regard to actual damages, if any.  Such forfeiture is a violation of the DCCPA § 28-309 (r).

23.    The Defendant attempts to limit the Plaintiffs' damage claims to a return of deposit which is in direct conflict to:  <u>Section 42-1904.09 of the Act - Escrow of deposits:</u> Any deposit made in regard to any disposition of a unit, including a nonbinding reservation agreement, shall be held in escrow until either delivered at settlement or returned to the prospective purchaser. Such escrow funds shall be deposited in a separate account for each condominium in a financial institution the accounts of which are insured by a federal or state agency. <u>These deposits shall bear interest at the passbook rate</u> then prevailing in the District of Columbia beginning with the first business day after the date deposited with Declarant or dilatant's agent.

24.    DCCPA § 28-309 (o) makes it unlawful to enforce an unconscionable term in sales or lease agreement.  The Defendant by its superior position to the Plaintiffs has implemented clauses of forfeiture throughout its Agreement (i.e. Exhibit 1: §§2.3, 3.2, 7.2, 12.1

inter alia) without permitting the Plaintiffs the opportunity to negotiate or reject such clauses. The Defendant's Agreement was a "Take it or leave it" deal. One hundred percent forfeiture, slanted in the favor of the Defendant.

25.    DCCPA § 28-309 (o) makes it unlawful to enforce an unconscionable term in sales or lease agreement. The Defendant by its superior position to the Plaintiffs has attempted to bar the Plaintiffs access to the Courts to redress the Defendant's wrongs (Exhibit 1 § 28). Defendant specifically precludes Plaintiffs access to the Courts without requiring Plaintiffs' consent.

26.    The Defendant's actions were in wanton and willful disregard for the rights of the Plaintiffs and require an award of the full statutory amount of treble damages, attorneys' fees, interest and cost of this action.

27.    The total amount in controversy is $466,677.00 exclusive of interest and costs, which amount exceeds the applicable jurisdictional requirements for maintenance of this action.

## V - SECOND CAUSE OF ACTION
## VIOLATION OF FEDERAL INTERSTATE LAND SALES ACT

28.    Plaintiffs reallege and restate paragraphs 1 through 27 inclusive as if fully stated herein.

29.    Defendant is a builder of "The Alta at Thomas Circle," "The Warehouse at Union Row" and the "Flats at Union Row" all developments in the District of Columbia; and "Chase Point Condominium" a Maryland development; and "The Carlyle Square" a Virginia Development. Defendant is an interstate builder and seller of property subject to the Federal Interstate Land Sales Act 15 U.S.C. §1701 *et seq.*

30.    ILSA  15 U.S.C. § 1703 (a)(2)(A) specifically prohibits the Defendant from making use of any means or instruments of transportation or communication in interstate commerce, or of the mails to employ any device, scheme or artifice to defraud.

31.    By Defendant's violations of D.C. Condominium Act §42-1904.02; and DCCPA at §§ 28-3904 (a), (b), (j), (r) and (o); Defendant has also engaged in the type acts which are prohibitions under ILSA 15 U.S.C. § 1703 (a)(2)(A).

32.    Further, Defendant's predatory practice of "forcing" Plaintiffs and other similarly situated purchasers to exclusively use their own affiliated lending agency and title company has violated ILSA 15 U.S.C. § 1703 (a)(2)(A) by penalizing Plaintiffs $5,000.00, for not using the Defendant's affiliated lending agency (Exhibit 1 at §§ 3,2 and 7.3).

33.    Defendant has violated ILSA 15 U.S.C. § 1703 (a)(2)(A) by requiring Plaintiffs to forfeit their deposits by requiring Plaintiff's to waive all their legally entitled rights under statute.

34.    Defendant has violated ILSA 15 U.S.C. § 1703 (a)(2)(A) by requiring Plaintiffs to forfeit their right to seek redress in a court of law.

35.    ILSA  15 U.S.C. § 1709 (b) extends the (purchaser) Plaintiff the right to bring an action at law or equity against the (seller) Defendant to enforce any right under subsection 15 U.S.C. §1701 *et seq*

36.    Defendant seeks to deny Plaintiffs' access to this Court through the insertion of (Exhibit 1 § 28) of an unconscionable, non negotiable clause of adhesion.

37.    ILSA  15 U.S.C. § 1709 (c) permits the Plaintiffs to recover interest, court costs and reasonable attorneys' fees in addition to the amount actually deposited.

38.     The Defendant's actions were in wanton and willful disregard for the rights of the Plaintiffs under ILSA and require an award of the full statutory amount and punitive damages, attorneys' fees, interest and cost of this action.

## VI – JURY TRIAL

39.     Plaintiffs request a jury trial on all counts.

**Wherefore,** Plaintiffs demand judgment against this Defendant on:

Count I, for violation of the District of Columbia Consumer Protection Act, $466,677.00 plus interest at the rate of six (6%); and, and such further relief as the Court may deem just and equitable.

Count II, for violation of the Federal Interstate Land Sales Act, $466,677.00 plus $50,000.00 punitive damages; and court costs and reasonable attorneys' fees and such further relief as the Court may deem just and equitable.

Executed: August 13, 2007          Attorney for Plaintiffs


___/s/_____
Howard R. Shmuckler, Esq. DC Bar 395462
Law Offices Howard R. Shmuckler
1700 Pennsylvania Ave. NW
Suite 400
Washington, DC 20006-4707
T: (202) 349-4034
F: (202) 349-1499



**BuildTopia**
Builder Collaboration Solutions

Home | Enhanced Reports | Messages (350) | Help | My Profile | Log Out

Welcome Sadie Simpson

Home > Union Row Flats: Sales Rep > Prospects > Workup List > **Options**

| To Do | Prospects | Buyers | Broker/Mortgage Co List | SPEC List | Lot List | Documents |

### Prospect Report

Search Prospects | Add Prospect

| Summary | Prospect Info | Survey | Workup | Tasks | Financials | Broker Info | Mort Comp Info | << go back |

>> Prospect: Omid Rokni

### Options for Workup # 1  [View all workups]

Select Opt's | Create NSO | Create Offer

| Date | Lot # | Unit Type | Base | Premium | Options | Total Price |
|------|-------|-----------|------|---------|---------|-------------|
| 02/24/2006 | 313 | F--1BR/Den/2BA(a) | $414,900.00 | $0.00 | $0.00 | $414,900.00 |

-- Current Options --     Filter

(Note: You must click on **SAVE** to commit option selections below before going to a new category.)

  

**Bold** = Standard Option
[= Mandatory Option  *] = Option Locked Out   S= Option from SPEC  X= Unavailable Option

| Option Code | Option Category | Description | Quantity | Unit Price | Total Price | Internal Notes | Selection Notes | Documents |
|-------------|-----------------|-------------|----------|-----------|-------------|----------------|-----------------|-----------|
| | | | **OPTIONS TOTAL:** | | **$0.00** | | | |
| 05.B.0120.040.001 | 05B-Kitchen Lighting | Kitchen Island Pendant Light Fixture WAC - Model# G611 w/QP-601-PT, White | 1 | $0.00 | $0.00 | | | Documents (0) |
| 05.C.0210.010.001 | 05C-Kitchen Cabinetry | Kitchen Cabinetry Maple - Horizontal Shaker Style - Stained "Aged Birch" | 1 | $0.00 | $0.00 | | | Documents (0) |
| 05.D.0300.000.008 | 05D-Kitchen Countertops | Kitchen Countertops Color: "Absolute Black (Indian)" Polished | 1 | $0.00 | $0.00 | Select Backsplash from Option List. | | Documents (0) |
| **05.D.0360.010.001** | **05D-Kitchen Countertops** | **Kitchen Countertops - Backsplash Match Countertop - 4 in.** | **1** | **$0.00** | **$0.00** | | Standard Option | Documents (0) |
| **05.E.0410.010.001** | **05E-Kitchen Sink/Trim** | **Kitchen Sink Drop-In Single Basin** | **1** | **$0.00** | **$0.00** | | | Documents (0) |
| 10.A.0020.020.002 | 10A-Living/Dining Flooring | Living/Dining Flooring Hardwood - Color: "Caramel (E911)" | 1 | $0.00 | $0.00 | | | Documents (0) |
| **10.Q.3110.000.001** | **10Q-Living/Dining Ceiling** | **Living/Dining Room Ceiling Unfinished Ceiling** | **1** | **$0.00** | **$0.00** | | | Documents (0) |
| 21.P.3000.000.001 | 21P-Bathroom A (1) | Bathroom A (1) Packages Creme Package | 1 | $0.00 | $0.00 | Floor Tile- Pearalbes Crema Naturale | Master Bath | Documents (0) |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 23.P.3000.000.001 | 23P-Bathroom A (2) | Bathroom A (2) Packages Creme Package | 1 | $0.00 | $0.00 | Base-Zocalo Crema Naturale Shower/Bath Tile-Mosaico Sarna Crema Floor Tile-Pedralbes Crema Naturale Base-Zocalo Crema Naturale Shower/Bath Tile-Mosaico Sarna Crema | Common Bath | Documents (0) |
| 40.A.0010.020.002 | 40A-Master Bedroom Flooring | Master Bedroom Flooring Carpet - Color: "Flax (727)" | 1 | $0.00 | $0.00 | | | Documents (0) |
| 55.A.0020.020.002 | 55A-Den Flooring | Den Flooring Hardwood - Color: "Carmel (E911)" | 1 | $0.00 | $0.00 | | | Documents (0) |

**OPTIONS TOTAL:** $0.00

  

Contact Us | Terms & Conditions | Privacy Notice | User Agreement
©2006 BuildTopia, Inc. | Trademark and Copyright Notice



**Addendum to**
**The Flats at Union Row, A Condominium**
**Condominium Unit Purchase Agreement**

It is hereby agreed and understood by the Purchaser that the standard finish selections and upgrade Options, if applicable, that have been chosen by Purchaser are final and NO changes will be allowed after five (5) days from the date below.

Additionally, pursuant to Paragraph 4.2 of the Purchase Agreement, Purchaser shall pay ½ of the total Option cost simultaneously with execution of a Change Order Addendum.   Not withstanding anything contained hereinto to the contrary, if Purchaser fails to remit a negotiable First Options Payment (as defined under the Purchase Agreement) to Seller within five (5) days of date below, Purchaser waives the right to the selected upgrade Options and shall accept Seller's choice of standard finish selections in lieu of such Options.

Purchaser further acknowledges that variations in, including but not limited to, color, dye lot and markings of the standard finish selections and upgrade Options as shown in the Midtown Design Center may occur.   Purchaser accepts such variations in selections and Options when installed in Unit.

By signature below, Purchaser acknowledges and accepts the above statements and approves of the selections and Options indicated herein.   Unless specify modified herein, all other terms and conditions of the Purchase Agreement shall remain in full force and effect.

Purchaser: _____     Date: 2/25/06

Purchaser: _____     Date: _____

Seller: _____     Date: 2/27/06

# FAX Cover Sheet

**Company:** PN Hoffman Realty

**To:** Joseph Silverstein          **FAX:** (202) 232-8972

**From:** Omid Rokni          Date: 6-6-07

**Subject:**     The Flats at Union Row - Painted Ceiling Acknowledgement

**Number of pages** (including cover):   4

**NOTES:**

## ACKNOWLEDGEMENT

By signing below, I acknowledge that I have requested to have the concrete ceiling in my unit painted, the color of which will be tinderbox.


OMID ROKNI
_____
Name

_____          6-6-07
Signature                         _____
                                  Date

BuildTopia - Review Contract

Page 1 of 2

# BuildTopia

Home > Union Row Flats: Sales Rep > Buyers > View Offer

| To Do | Prospects | Buyers | Broker/Mortgage Co List | SPEC List | Lot List |

## Buyer Report

Summary    Survey    Workup    Tasks    Financials    Broker Info    Mort Comp Info    << go back

## Buyer Info

Documents (0) | Back to Buyer List

| Buyer | Omid Rokni | Broker | No broker associated with the prospect. | Plan | F--1BR/Den/2BA(a)  (F) |
| Sales Rep | Quatia Barksdale | Lot # | 313 | Contingency Date | |

## Pricing and Offer

View/Print Contract    View/Print Pricing Addendum

| Base Price | $414,900.00 | |
| Lot Premium | $0.00 | |
| Options | $42,000.00 | [See Below] |
| NSO | $0.00 | [See Below] |
| Addenda | $0.00 | [See Below] |
| Sub Total | $456,900.00 | |
| Incentives | ($0.00) | [See Below] |
| Asking Price | $456,900.00 | |
| Differential (Delta) | $0.00 | [See Below] |
| Total Price | $456,900.00 | |

## Prospect Deposits

Add Deposit

| Deposit Date | Deposit Amount | Deposit Type | Deposit Notes | Deposit Paid | Actions |
|---|---|---|---|---|---|
| 05/11/0005 | $2,940.00 | Contract | Parking Deposit. | Paid | edit |
| 09/23/0004 | $29,043.00 | Contract | Check # 309. Contract Deposit. | Paid | edit |

## Builder Incentives

| Name | | Amount | Action |

No incentives have been applied to this prospect

(Back to Top)

## Options

X = Unavailable; S = Option from SPEC; Bold = Standard Option

| Option Code | Description | Qty. | Retail Price | Total Price | Internal Comments | Selection Notes | |
|---|---|---|---|---|---|---|---|
| 05.B.0120.040.001 Kitchen Island Pendent Light Fixture | WAC - Model# G611 w/QP-601-PT, White | 1 | $0.00 | $0.00 | | | 0 |
| 05.C.0210.010.001 Kitchen Cabinetry | Maple - Horizontal Shaker Style - Stained "Aged Birch" | 1 | $0.00 | $0.00 | | | 0 |
| 05.D.0300.000.008 Kitchen Countertops | Color: "Absolute Black (Indian)" Polished | 1 | $0.00 | $0.00 | Select Backsplash from Option List. | | 0 |
| 05.D.0360.010.001 Kitchen Countertops - Backsplash | Match Countertop - 4 in. | 1 | $0.00 | $0.00 | | Standard Option | 0 |

BuildTopia - Review Contract                                    Page 2 of 2

| | | | | | | |
|---|---|---|---|---|---|---|
| 05.E.0410.010.001<br>Kitchen Sink | Drop-In Single Basin | 1 | $0.00 | $0.00 | | 0 |
| 10.A.0020.020.002<br>Living/Dining Flooring | Hardwood - Color:<br>"Caramel (E911)" | 1 | $0.00 | $0.00 | | 0 |
| 10.Q.3110.000.002<br>Living/Dining Room<br>Ceiling | Painted Ceiling - Tinderbox | 1 | $0.00<br>~~New Price~~<br>~~$2,000.00~~ | $0.00 | All 8th and 9th Floor Units<br>add $1000 upgrade cost. | 0 |
| 21.P.3000.000.001<br>Bathroom A (1)<br>Packages | Creme Package | 1 | $0.00 | $0.00 | Floor Tile-Pedralbes Crema  Master Bath<br>Naturale Base-Zocalo<br>Crema Naturale<br>Shower/Bath Tile-Mosaico<br>Sarria Crema | 0 |
| 23.P.3000.000.001<br>Bathroom A (2)<br>Packages | Creme Package | 1 | $0.00 | $0.00 | Floor Tile-Pedralbes Crema  Common Bath<br>Naturale Base-Zocalo<br>Crema Naturale<br>Shower/Bath Tile-Mosaico<br>Sarria Creme | 0 |
| 40.A.0010.020.002<br>Master Bedroom<br>Flooring | Carpet - Color: "Flax<br>(727)" | 1 | $0.00 | $0.00 | | 0 |
| 55.A.0020.020.002 Den<br>Flooring | Hardwood - Color: "Carmel<br>(E911)" | 1 | $0.00<br>~~New Price~~<br>~~$2,100.00~~ | $0.00 | | 0 |
| 90.K.1210.000.001<br>Parking | Standard (S) | 1 | $42,000.00 | $42,000.00 | Indicate Parking Space #  PS# G3-24<br>in Selection Notes. | 0 |

**TOTAL OPTIONS**       $42,000.00

[Back to Top]

## NSOs

| Date | NSO # | Request | | Status | Price |
|---|---|---|---|---|---|
| | | | | Total Price for Added NSOs: | $0.00 |

[Back to Top]

## Addenda History

| Date<br>Created | Date<br>Accepted | Number  Subject | | Price | Actions |
|---|---|---|---|---|---|
| | | No addenda found | | | |

[Back to Top]

## Comments History

| Date | Author | Comment |
|---|---|---|
| 2/27/2006 | Sadie Simpson | Selections complete 2/25/06. |
| 3/3/2006 | Sadie Simpson | Approved by Sadie Simpson 3/3/06. |

[Back to Top]

## Differential Comments History

| Date | Inserted By | Comment | New Amount |
|---|---|---|---|
| | | No differentials have been applied to this Agreement | |

[Back to Top]

Contact Us | Terms & Conditions | Privacy Notice | User Agreement<br>©2007 BuildTopia, Inc. | Trademark and Copyright Notice



# THE FLATS AT UNION ROW

## REVISED
## UNIT SPECIFICATIONS
## #313



**LIVING AND DINING AREAS**

- Bruce Hardwood Flooring.
- Surface mounted truck lighting.
- Approximately 9' ceilings with exposed concrete, spiral ductwork and sprinklers throughout unit.

**KITCHEN**

- Bruce Hardwood Flooring.
- Drop-in single basin stainless sink.
- Kohler faucet with pull-out spray.
- Granite countertop with 4" granite backsplash.
- Custom cabinets with maple doors stained in Aged Birch or Natural.
- Cabinet pulls in brushed nickel.
- Kitchen Appliance Package/Type 2:
  - GE Energy Star Bottom Freezer, Stainless, 19.5 Cu. Ft.
  - GE Profile 30" Slide-In Electric Range, Stainless
  - GE Profile Spacemaker Microwave, Stainless
  - GE Profile Built-In 24" Dishwasher, Stainless

**BEDROOM/DEN AREA (S)**

- Sisel style nylon carpeting.
- Privacy partitions of brushed aluminum and translucent panels (where applicable).

**BATHROOM(S)/CLOSETS**

- European inspired square porcelain tile flooring (approximately 17"X17").
- Duravit white single piece toilet.

Due to continuing changes in products, building codes and availability of materials, Seller reserves the right to incorporate new design features or equivalent materials at any time without notice.

- Duravit white pedestal sink with surface mounted mirror above.
- Danze single handle chrome faucet.
- 36" or 48" (where applicable) shower stall, with pre-formed shower pan and frameless shower doors.
- Danze single handle tub and shower faucet.
- Shower surrounded in porcelain tile.
- Recessed general lighting.
- Surface mounted light in bathroom.
- Adjustable closet rods and shelves.
- Drop drywall ceiling with approximately 8'0" ceiling height.



## UTILITY FEATURES

- GE 27" stackable white washer/dry, white.
- Water source heat pump for electric cooling.
- Cable TV, Internet and phone provided through structured cable outlets – RG6 and CAT5.
- Cable TV, satellite TV and internet service is rough-in only, final connection by applicable service provider.
- 4-line phone cabling is rough-in only, final connection by applicable service provider.
- Hard-wired smoke detectors.



Due to continuing changes in products, building codes and availability of materials, Seller reserves the right to incorporate new design features or equivalent materials at any time without notice.

# THE FLATS AT UNION ROW

## UNIT SPECIFICATIONS



LIVING AND DINING AREAS
- Bruce Hardwood Flooring.
- Surface mounted track lighting.
- Approximately 9' ceilings with exposed concrete, spiral ductwork and sprinklers throughout unit.

KITCHEN
- Bruce Hardwood Flooring.
- Drop-in single basin stainless sink.
- Kohler faucet with pull-out spray.
- Granite countertop with 4" granite backsplash.
- Custom cabinets with maple doors stained in Aged Birch or Natural.
- Cabinet pulls in brushed nickel.
- Kitchen Appliance Package/Type 4:
    - GE Energy Star Bottom Freezer, Stainless, 19.5 Cu. Ft.
    - GE Profile 30" Slide-In Electric Range, Stainless
    - GE Profile Spacemaker, Stainless
    - GE Monogram 18" Built-In Dishwasher, Stainless

BEDROOM/DEN AREA (S)
- Sisel style nylon carpeting.
- Privacy partitions of brushed aluminum and translucent panels (where applicable).

BATHROOM(S)/CLOSETS
- European inspired square porcelain tile flooring (approximately 17"X17").
- Duravit white single piece toilet.

Due to continuing changes in products, building codes and availability of materials, Seller reserves the right to incorporate new design features or equivalent materials at any time without notice.

- Duravit white pedestal sink with surface mounted mirror above.
- Danze single handle chrome faucet.
- 36" or 48" (where applicable) shower stall, with pre-formed shower pan and frameless shower doors.
- Danze single handle tub and shower faucet.
- Shower surrounded in porcelain tile.
- Recessed general lighting.
- Surface mounted light in bathroom.
- Adjustable closet rods and shelves.
- Drop drywall ceiling with approximately 8'0" ceiling height.

UTILITY FEATURES
- GE 27" stackable white washer/dry, white.
- Water source heat pump for electric cooling.
- Cable TV, Internet and phone provided through structured cable outlets – RG6 and CAT5.
- Cable TV, satellite TV and internet service is rough-in only, final connection by applicable service provider.
- 4-line phone cabling is rough-in only, final connection by applicable service provider.
- Hard-wired smoke detectors.



Due to continuing changes in products, building codes and availability of materials, Seller reserves the right to incorporate new design features or equivalent materials at any time without notice.



# THE FLATS AT UNION ROW, A CONDOMINIUM
## CONDOMINIUM UNIT PURCHASE AGREEMENT

Title to be conveyed in the name(s) of:

Omid Rokni

Unit No: 313                           Percentage Interest: .464%
Parking Space No[s].: G3-24            Residential Expense
Storage Space No.: N/A                 Liability:        .502%

THIS CONDOMINIUM UNIT PURCHASE AGREEMENT (the "Agreement") is made between PNH UNION SQUARE L.L.C., a Delaware limited liability company ("Seller"), and Faye Rokni ("Purchaser") as of the 11th day of May, 20005 (the "Effective Date", such date being the date this Agreement is executed by the parties).

Seller desires to sell and Purchaser desires to purchase Condominium Unit No. 310 (the "Unit") and, if applicable, have assigned to such Unit the exclusive right to use and occupy Parking Space Number[s] G3-24 (the "Parking Space") as an Individual Limited Common Element (as defined in the Declaration) and, if applicable, Storage Space No. N/A (the "Storage Space") as an Individual Limited Common Element, in that certain condominium to be formed pursuant to the provisions of Section 42-1901.01, et seq., of the District of Columbia Code, 2001 edition, as amended (the "Condominium Act"), to be known as THE FLATS AT UNION ROW, A CONDOMINIUM (the "Condominium"), located at 2125 14th Street, N.W., Washington, D.C. 20009.

Seller and Purchaser, for good and valuable consideration, agree as follows:

1. PURCHASE AND SALE OF UNIT.

1.1 Seller agrees to sell to Purchaser, and Purchaser agrees to purchase, the Unit, together with the undivided interest in the Common Elements appertaining to the Unit as set forth in the Declaration of Condominium and, subject to the terms of this Agreement and if applicable, the assignment of the exclusive right to use and occupy the Parking Space and/or the Storage Space as an Individual Limited Common Elements to be made appurtenant to the Unit. The percentage interest of the Unit in the Common Elements of the Condominium (the "Percentage Interest"), as set forth in "Exhibit B" to the Condominium Declaration and as shown on "Exhibit 8" of the Public Offering Statement of the Condominium, is as set forth hereinabove. The Unit is part of a mixed use condominium consisting of a residential units and

1



commercial/retail units.   Certain expenses of the Condominium will be payable only by the owners of commercial units, and other expenses ("Residential Expenses") will be payable only by the owners of residential units.   Expenses of the Condominium payable by owners of commercial units and residential units are referred to herein as "Common Expenses."   The percentage of liability of the Purchaser's Unit toward the payment of Common Expenses is the Percentage Interest of the Unit.   The percentage of liability of the Purchaser's Unit for the payment of Residential Expenses as set forth in "Exhibit B" of the Bylaws, and as shown on "Exhibit 8" of the Public Offering Statement, is identified on Page No. 1 hereinabove.   The Seller shall warrant the Unit against structural defects in accordance with the requirements of the Condominium Act (including without limitation Section 1903.16 thereof).   The warranty rights of the Purchaser and the warranty obligations of the Seller are set forth on the Limited Condominium Warranty attached hereto as Exhibit "F".   Any furnishings and personal property displayed in any model unit or in any PN Hoffman, Inc. Sales and Design Center (the "Sales and Design Center") are not part of the Unit and are not included in the purchase price of the Unit. All illustrations, models, architectural renderings and unit features shown on any promotional or other materials provided to Purchaser, or exhibited in the Sales and Design Center, are for display or illustrative purposes only, and may not be representative of Unit or the Condominium building features.   Additionally, any features of the Unit or Condominium building shown on any floor plans, marketing materials, plats, plans, or any other promotional materials are subject to change by Seller in its discretion due to such factors as, but not limited to, building constraints, inspections and permitting approvals.   Estimated dimensions or square footages shown in any floor plan sketches or provided in other related sales materials are approximations only.

      1.2    Purchaser acknowledges that the Unit, Parking Space, and Storage Space are *not* being sold or assigned to Purchaser on a "per square foot" basis.   The Purchaser acknowledges that the Parking Space and Storage Space will be delivered unimproved, except as otherwise provided herein.   Notwithstanding the assignment of the numbered Parking Space and/or Storage Space to Purchaser identified in Paragraph 1.1 above (if applicable), Seller shall have the right, in Seller's sole discretion, to substitute a different numbered Parking Space and/or Storage Space within the Condominium (i) in the event an error is made by Seller in the allocation of said Parking Space and/or Storage Space to Purchaser or (ii) in the event Seller is required to relocate said Parking Space and/or Storage Space in order to comply with applicable law (including without limitation the Americans With Disabilities Act); provided, however, that such substituted Parking Space and/or Storage Space shall be of comparable value to the Parking Space and/or Storage Space specified in Paragraph 1.1 above, as determined by Seller in its reasonable discretion.   Purchaser hereby agrees that the substitution by Seller of a different Parking Space and/or Storage Space within the Condominium shall not entitle Purchaser to terminate this Agreement nor give rise to any claims for damages against Seller.   Purchaser acknowledges and agrees that, in the event the Parking Space and/or Storage Space to be assigned to Purchaser pursuant to the terms hereof is/are not available for immediate assignment

to Purchaser at the time of Settlement due to ongoing construction activity at the Condominium, then Seller shall have the right in its sole discretion to temporarily designate an alternative parking space[s] and/or storage space[s] within the Condominium for use by the Purchaser until the Parking Space and/or Storage Space to be permanently assigned to Purchaser become available; provided that such temporary assignment period shall in no event exceed 365 calendar days). In no event shall Seller's designation of a temporary, substitute parking space or storage space entitle Purchaser to terminate this Agreement, give rise to any claims for damages against Seller or entitle Purchaser to delay or postpone the date of Settlement. The provisions of this Paragraph shall expressly survive the Settlement hereunder.

All references herein to the "Unit" shall be deemed to include the Residential Unit (as defined in the Declaration), (unless otherwise noted herein or the context indicates otherwise), and, as applicable, all Limited Common Elements (including without limitation the Parking Space and Storage Space, as applicable) assigned or to be assigned to the Residential Unit as provided herein.

2. PURCHASE PRICE AND TERMS OF PAYMENT.

2.1 The purchase price of the Unit is Four Hundred Fourteen Thousand Nine Hundred Dollars ($414,900.00). The purchase price of the assignment of the Parking Space is Forty-Two Thousand Dollars ($42,000.00). The purchase price of the assignment of Storage Space is not applicable. The total purchase price for the Unit and, if applicable, the assignment of Parking Space and/or Storage Space (such total purchase price, exclusive of settlement costs, condominium fees, and prorated amounts of prepaid items, is collectively referred to as the "Total Purchase Price") shall be paid as follows:

| | |
|---|---|
| (1) Deposit upon signing this Agreement, to be applied as partial payment of the Total Purchase Price, receipt of which amount is hereby acknowledged | $31,983.00 |
| (2) (a.) __X__ Proceeds of conventional loan. (b.) ____ All cash. | TBD |
| (3) Balance Due at time of Settlement, in cash or by certified or cashier's check. | TBD |
| **Total Purchase Price**................................................... | **$456,900.00** |

The Total Purchase Price may be subject to adjustments, including but not limited to, fees for additional Options (as defined hereinbelow), as more fully set forth in Paragraph 4 of this

3

Agreement, which adjustments shall be reflected in a Change Order Addendum, which is attached as Exhibit "C" hereto.

2.2   Seller shall place Purchaser's deposit in escrow in an interest-bearing account in a bank or savings and loan association in an escrow account in accordance with the requirements of Section 42-1904.09 of the Condominium Act.  The deposit together with any interest earned thereon (the "Deposit") shall be credited to Purchaser at Settlement (as defined in Paragraph 7) and the Total Purchase Price shall be paid to Seller by certified or cashier's check or other immediately available funds at Settlement.  The term "Deposit" includes any interest earned on any deposit made by the Purchaser under this Agreement.  The Deposit shall not be deemed to include any amounts paid for Options.

2.3     The Deposit shall be disbursed upon the following terms:  (a) if Settlement is made, the Deposit will be delivered to Seller at the time of Settlement, or (b) if Settlement is not made as provided herein because of Purchaser's default or failure to comply with any term of this Agreement, Purchaser shall forfeit the Deposit and any other amounts paid under this Agreement, including any amounts paid for Options, which may be retained by Seller in its sole discretion as liquidated damages.

3. FINANCING

Purchaser hereby elects the following method of financing, pursuant to the terms of this Agreement:

(Check One)

_____ No financing arrangement (all cash)
_____ Financing arranged through lender of Purchaser's choice
__X____ Financing arranged through  a lender designated by Seller (a "Designated Lender")

Regardless of whether Purchaser elects to pursue financing through a lender of Purchaser's choice, a Designated Lender, or pay all cash at Settlement, Purchaser must submit a written mortgage loan pre-approval letter from one of the Designated Lenders prior to ratification of this Agreement.

3.1     <u>No Financing Arrangement (all cash)</u>.  If Purchaser elects to pay the Purchase Price all in cash, then this Agreement shall be in no way contingent upon Purchaser obtaining any financing and Purchaser assumes full responsibility to initiate and pursue all steps necessary to obtain the funds required for Settlement.  Further, within seven (7) days from the Effective Date, Purchaser shall provide Seller with commercially reasonable proof of Purchaser's

4



financial ability to pay the balance due at Settlement. If Purchaser fails to provide such commercially reasonable proof, then Seller may terminate this Agreement by providing notice to Purchaser within thirty (30) days from the Effective Date, in which case the Deposit shall be returned to Purchaser. If Purchaser fails to pay the Purchase Price due at Settlement, then this Agreement, at the sole option of Seller, may be terminated and the Deposit retained by Seller. **Purchaser acknowledges that, in the event Purchaser has elected to purchase the Unit with no financing arrangement (all cash), then the purchase of the Unit and the assignment of a Parking Space and/or a Storage Space is in no way contingent on Purchaser's ability to obtain financing for its proposed purchase of the Unit and the assignment of the Parking Space and/or the Storage Space, whether from a lender of Purchaser's choice, or a Designated Lender.**

        3.2   <u>Financing Arranged through Lender of Purchaser's Choice or Designated Lender(s).</u> If Purchaser elects to obtain financing through a lender of Purchaser's choice or through a Designated Lender, then this Agreement shall be contingent upon financing for a period of fifteen (15) days from the Effective Date (the "Financing Contingency Period"). Within seven (7) days from the Effective Date, Purchaser shall provide Seller with (i) a letter from one of the Designated Lenders stating that the Purchaser is approved for a mortgage in the amount required to purchase the Unit and the assignment of a Parking Space and/or Storage Space, as applicable (less the amount of the Deposit and any amounts that will be paid in cash by Purchaser at Settlement), subject only to commercially reasonable conditions and in accordance with the Designated Lender loan criteria described hereinbelow, and (ii) commercially reasonable proof of Purchaser's financial ability to pay the balance due at Settlement. If during the Financing Contingency Period, Purchaser cannot obtain financing approval, then, provided Purchaser has not breached his or her obligation to apply for financing, then Purchaser at its sole option may terminate this Agreement and the Deposit shall be returned to Purchaser. Purchaser shall be deemed to have breached his or her obligation to apply for financing under this Agreement upon the occurrence of any of the following: (I) Purchaser fails to timely file a complete application for financing so that the letter from a lender required pursuant to Section 3.2(i) above can be provided to Seller within ten (10) days after the Effective Date; (II) Purchaser materially misrepresents his or her financial situation or intentions at the time Purchaser executes this Agreement; (III) Purchaser represents his or her financial situation or intentions to the lender as materially different from the situation and intentions represented to Seller at the time this Agreement is executed by Purchaser (unless Purchaser's financial situation has in fact changed); (IV) Purchaser voluntarily or involuntarily changes his or her financial situation so that such change causes the Purchaser not to obtain financing; and (V) Purchaser fails to promptly, diligently, and in good faith furnish the lender with all information necessary to consider Purchaser's application for financing and sign all documents signed by the lender, within the specified time limits. If Purchaser fails to obtain necessary financing as a result of the occurrence of any of (I)-(V) of this sub-paragraph (b), or otherwise fails to timely file all applications and comply with all other lender requirements within

the specified time frames, or timely if there are no specified time frames, then at the option of Seller, said option to be exercised, if at all, within thirty (30) days after the Effective Date, the Purchaser shall forfeit the Deposit and all interest accrued thereon as liquidated damages. Upon expiration of the Financing Contingency Period, this Agreement shall not be contingent on financing and if Purchaser fails to pay the Purchase Price due at Settlement, then this Agreement, at the sole option of Seller, may be terminated, and Seller shall have all the rights and remedies available to Seller upon a default of Purchaser as set forth in Section 12 hereinbelow.

If a Designated Lender finances the purchase of the Unit and the assignment of the Parking Space and/or Storage Space, as applicable, Purchaser shall be entitled to a credit in the amount of $10,000.00 towards closing costs at Settlement and Purchaser will pay all other lender fees, including without limitation the loan origination fee, loan discount fee, appraiser, inspection and credit report fees. Purchaser hereby expressly acknowledges and agrees that such credit may be paid at Settlement either by the Designated Lender or Seller. If Purchaser elects to obtain financing from a lender of Purchaser's choice, then Purchaser shall pay all lender's fees including without limitation the loan origination fee, loan discount fee, appraiser, inspection and credit report fees, Purchaser shall not receive a credit in the amount of $10,000.00 at Settlement toward closing costs, and Seller shall not be obligated to pay any fees charged by a lender.

Purchaser's credit will be subject to approval by the Designated Lender making such mortgage loan to Purchaser, although Purchaser may ultimately use any Lender of his or her choice. Designated Lenders shall approve Purchaser based on the following loan criteria: 10/1 ARM at annual interest rate of 7 ½ %, requiring monthly payments principal and interest, and with a Deposit equal to ten percent (10%) of the total purchase price.

PURCHASER HEREBY ACKNOWLEDGES THAT THIS AGREEMENT SHALL  IN NO WAY BE CONTINGENT UPON FINANCING IF PURCHASER ELECTS NOT TO OBTAIN FINANCING AS PROVIDED IN SECTION 3.1 ABOVE, AND, IF PURCHASER ELECTS TO OBTAIN FINANCING THROUGH A DESIGNATED LENDER OR THROUGH A LENDER OF PURCHASER'S CHOICE, THEN THIS AGREEMENT WILL BE CONTINGENT ONLY FOR A PERIOD OF FIFTEEN (15) DAYS, SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SECTION 3.2 ABOVE.  PURCHASER HEREBY ACKNOWLEDGES THAT IN ALL EVENTS THIS AGREEMENT IS NOT CONTINGENT UPON THE SALE OR RENTAL OF PURCHASER'S PRESENT HOME, IF ANY, OR ANY OTHER PROPERTY, AND THAT ANY CONTINGENCY A LENDER MAY SET FORTH IN A PRE-APPROVAL LETTER IS A CONTINGENCY SOLELY PLACED ON PURCHASER.

6

Purchaser promptly shall advise Seller in writing of any material change in Purchaser's financial condition.

4. UNIT OPTIONS.

4.1    In the event that Seller offers certain options or upgrades for the Unit, Purchaser may select from a list of such options and upgrades offered by Seller (collectively the "Options"). The cost of any Options will be set forth in the materials to be provided separately to Purchaser, to the extent the cost thereof are not otherwise set forth in the exhibits to this Agreement.

4.2    If Purchaser elects to purchase any Options from Seller, Purchaser shall pay Seller the amount of  one half (1/2) of the total cost of the Options (the "First Options Payment") simultaneously with execution of a Change Order Addendum (in the form attached hereto as Exhibit "C").   Purchaser hereby acknowledges and agrees that the First Options Payment shall not constitute a portion of the Deposit, and that Seller shall have the right to deposit the First Options Payment directly into the Seller's operating account and to expend the First Options Payment in order to carry out the implementation and installation of  the Options.  The balance due for the Options (the "Final Options Payment") shall be paid over to Seller at Settlement. Purchaser acknowledges that the First Options Payment shall be non-refundable to Purchaser. Accordingly, if Settlement does not occur for any reason other than Seller's default, including, but not limited to, Purchaser's inability to obtain financing or lack of funds to close, Seller shall have the right to retain the entire First Options Payment made to Seller under this Agreement, in addition to any other remedies that Seller may have.

5. CONDOMINIUM ASSESSMENTS.

5.1  Purchaser is obligated and agrees to pay monthly his or her Unit's Percentage Interest of the Common Expenses of the Condominium, as set forth in "Exhibit B" the Declaration and Exhibit 8 of the Public Offering Statement and his or her percentage of liability for the payment of Residential Expenses of the Condominium, as set forth in "Exhibit B" of the Bylaws and Exhibit 8 of the Public Offering Statement.  Seller's estimate as of the Effective Date of the aggregate monthly Condominium fee payable for the Unit for Common Expenses and Residential Expenses is set forth in Exhibit 8 of the Public Offering Statement.  Additionally, the owner of each unit to which a parking space is assigned as an Individual Limited Common Element will be charged initially a monthly fee of $25.00  for each such parking space, and the owner of each unit to which a storage space is assigned will be charged initially a monthly fee of $10.00 for each such storage space, such fees being potentially subject to the same annual increases as the condominium assessments and fees for the Units.  Purchaser acknowledges and

agrees that the projected fees payable by Purchaser described in Exhibit 8 of the Public Offering Statement are only estimates and are not guaranteed by Seller.

6. CONVEYANCE OF TITLE.

6.1  At Settlement, Seller shall convey to Purchaser good and merchantable title to the Unit (together with the Unit's respective undivided Percentage Interest in the Common Elements) by special warranty deed, subject only to the general real estate taxes and water and sewer assessments for the current tax year not then due; the Repurchase Right, as more particularly described in Paragraph 31 hereinbelow; the Condominium Act, the Declaration, Bylaws, Plat and Plans and Rules and Regulations of the Condominium; easements, covenants and conditions of record; ordinances and regulations of competent municipal or other governmental authorities; easements for sewers, water, gas, fuel line, drainage, electric, telephone and other similar utilities, if any, granted or to be granted; the Repurchase Right; and Purchaser's deed of trust, if any.  Purchaser shall, upon request, execute any instruments creating or consenting to such covenants, conditions, easements, or restrictions.  At the time of Settlement, Seller will also cause the Parking Space and Storage Space, if applicable, to be assigned to the Unit as an Individual Limited Common Elements appurtenant thereto.

6.2  In the event that, upon examination, the title should be found defective and the defects are of such character that they may be remedied within a reasonable time by legal action to perfect the title, such action must be taken promptly by and at Seller's reasonable expense, whereupon the time herein specified for full Settlement by the Purchaser will thereby be extended for the period necessary for such action, not to exceed six (6) months.  If Seller is unable to perfect title as specified herein, then Seller may terminate this Agreement and cause the Deposit and any advance for Options to be returned to Purchaser.  In such case, Seller is expressly released from all other liability for damages arising from such event, and in no event shall Seller be liable for any damages for defects in title.  If Seller chooses to terminate this Agreement and return the Deposit and advance payments for Options to Purchaser pursuant to this Paragraph, then all rights and liabilities of the parties under this Agreement shall forthwith terminate.

7. SETTLEMENT.

7.1    Settlement on the purchase and sale of the Unit (the "Settlement") shall occur on a date specified by a written notice (the "Settlement Notice") from Seller to Purchaser, (to be delivered to Purchaser only after the expiration of Purchaser's rights of rescission pursuant to the Condominium Act) stating that the Unit will be ready for conveyance by Seller (subject to completion of punch list items as set forth below in Paragraph 9.1) on the date specified in the

Settlement Notice (the "Settlement Date"), which date will be not fewer than ten (10) days from the date of the Settlement Notice. Purchaser shall complete Settlement on the Settlement Date.

       7.2    If Settlement does not occur on the Settlement Date for any reason other than Seller's default, including, but not limited to, Purchaser's inability to obtain financing or lack of funds to close, then Purchaser shall be in default under this Agreement and Seller shall have the right in its discretion to declare Purchaser to be in default. Upon such an occurrence, Seller may in its sole discretion terminate this Agreement and the Deposit provided herein, plus any amounts paid on account for Options, may be retained by Seller as fixed liquidated damages. Notwithstanding the foregoing, in the event Settlement is delayed due to Purchaser or Purchaser's lender, then, if requested in writing by the Purchaser, Seller may in its sole discretion agree to extend the date of Settlement for up to fifteen (15) days. Purchaser hereby agrees that Seller shall be entitled to payment by Purchaser at Settlement of an amount equal to $165.00 for each day that Settlement is delayed beyond the date specified in the Settlement Notice up to a maximum of fifteen (15) days. If Settlement is delayed more than fifteen (15) days beyond the Settlement Date specified in the Settlement Notice, then Seller may, in its sole discretion, (i) terminate this Agreement and in such event, the Deposit herein provided, plus any amounts paid on account for Options, may be retained by Seller as fixed liquidated damages; or (ii) agree to postpone Settlement further, in which case Purchaser shall agree to pay at Seller at Settlement an amount equal to $250.00 for the sixteenth (16th) day and each additional day that Settlement is delayed beyond the date specified in the Settlement Notice.

       7.3    At Settlement, Purchaser shall pay the Total Purchase Price for the Unit and, upon receipt thereof, Seller shall deliver the deed for the Unit. Purchaser shall be entitled to occupy and have possession of the Unit from and after Settlement. Purchaser shall pay at Settlement all settlement costs not previously paid, including, without limitation, credit report fee, lender's appraisal fee, District of Columbia Real Property Recordation Tax (1.1% as of the Effective Date), document recordation charges, fees for title examination, preparation of all documents of conveyancing and all mortgage instruments, settlement fees, notary fees, and fees for mortgagee's title insurance, private mortgage insurance premiums, if any, any loan origination, discount or similar fees, and fees for owners title insurance (if obtained) and other charges in the nature of prepaid expenses, escrows for taxes and the like. Purchaser shall also pay all Condominium assessments and initial capital contribution, as set forth in Paragraphs 5 and 7.4 respectively, due at Settlement. Seller will pay the D.C. Transfer Tax (1.1% as of the Effective Date) and, if one of the mortgage lenders (including the applicable loan officer(s) listed below) identified below are selected for Settlement, Purchaser shall be entitled to a credit described in Paragraph 3.2 hereinabove toward closing costs which otherwise would be chargeable to the Purchaser.

9



       Seller's Designated Lenders:
       First Savings Mortgage Corporation
       10401 Connecticut Avenue, Suite 103
       Kensington, Maryland 20895
       Contact:  Renee Schuster Voyta, Vice President

       Wells Fargo
       12701 Fair Lakes Circle, Suite 275
       Fairfax, VA 22033
       Contact:  W. Scott Hawkins, Home Mortgage Consultant

In the event that Purchaser decides to select a lender or a loan officer for Designated Lender other than as indicated above, Purchaser shall not be entitled to the credit in the amount of $10,000.00 toward closing costs as provided hereinabove.   Purchaser shall notify Seller in writing not less than sixty (60) days prior to the projected date of Settlement of its selection of settlement company or settlement attorney.  If no such notice is given to Seller within the aforementioned time period, then Seller may designate the title attorney or title company to conduct Settlement.

       7.4   Purchaser shall pay at Settlement as an initial capital contribution to the Condominium, an amount equal to two times (2x) the "Projected Total Monthly Assessment" for Common Expenses and Residential Expenses payable for the Unit as set forth in "Exhibit 8" of the Public Offering Statement of The Flats at Union Row, A Condominium ("Initial Working Capital"). The Initial Working Capital payment will be allocated to the Condominium's working capital funds.  The Initial Working Capital is in addition to, and not in lieu of, the regular monthly assessments payable in respect of the Unit, which will be prorated at Settlement, and this amount is nonrefundable.

       7.5   Purchaser hereby acknowledges that any information given to Purchaser by Seller, or any sales representative, employee, or agent of Seller with respect to anticipated dates for the delivery of title and possession of the Unit is not to be considered a material part of this Agreement or a material representation or warranty by Seller.

7.6 (a) Seller agrees and obligates itself to complete construction of the Property no later than thirty-six months following the date this Agreement is executed by the Purchaser. If Settlement shall not have occurred within thirty-six months after the execution of this Agreement by Purchaser, due to reasons within Seller's control, Purchaser shall have the option of either:

(i)     terminating this Agreement by written notice to Seller, delivered at any time prior to Seller's establishment of a settlement date as provided in Paragraph 7.1 of this Agreement, in which event Seller shall, if Purchaser shall not then be in default, cause the Deposit and all other payments made by Purchaser to Seller hereunder, if any, to be returned to Purchaser, and neither party shall have any further liability or obligation hereunder; or

(ii)    electing to proceed with the purchase of the Unit when the Unit is completed.

Notwithstanding the foregoing and any contrary provision set forth herein (including without limitation the arbitration provisions set forth in Section 28), Purchaser shall not be precluded from pursuing any remedies available under applicable law for Seller's wrongful breach or cancellation of this Agreement, including any rights to specific performance as required or authorized by the Interstate Land Sales Full Disclosure Act.

(b)     Settlement on the purchase of the Unit shall occur when Seller is legally permitted to convey the Unit, within thirty-six (36) months after execution of this Agreement by Purchaser; provided, however, that if Seller is delayed in the performance of the aforesaid obligation for reasons beyond the control of Seller, then the time for performance of Seller's obligation shall be extended for a reasonable period of time, and such delay shall not be considered a breach of this Agreement, provided that in no event shall Settlement be extended to a date more than forty-eight (48) months after execution of this Agreement by Purchaser. Reasons beyond the control of Seller for the impossibility of performance shall include, without limitation, acts of God, fire, earthquake, terrorism, flood, explosion, condemnation, or acts of governmental agencies asserting jurisdiction over the Condominium or the Property, and any other legally supportable justification under the laws of the District of Columbia, which would excuse Seller from completing the Unit within such thirty-six (36) month period. Notwithstanding anything to the contrary in this Agreement, if Settlement does not occur due to reasons set forth in this Paragraph, then, in the event Purchaser elects to terminate this Agreement, Seller's sole obligation to Purchaser shall be to cause the Deposit and fees paid for Options to be returned to Purchaser.

11



8. SETTLEMENT ADJUSTMENTS.

       8.1    All monthly condominium assessments (including without limitation Common Expenses and Residential Expenses) for the month in which Settlement is made, if any, real property taxes, insurance premiums, any assessments of water, sewer, or similar services to the Condominium, and any other prepaid or pro-ratable items shall be prorated between Purchaser and Seller as of the date upon which Seller is prepared to close according to the terms of this Agreement. Thereafter, each of these items shall be assumed and paid by Purchaser. In the event that at time of Settlement any such item has not been allocated among the units the total of such items for the Condominium shall be allocated among the units (on an estimated basis, if necessary) in accordance with each unit's Percentage Interest as set forth in the Declaration.

9. INSPECTIONS.

       9.1 <u>Pre-Settlement Inspection</u>. Seller shall notify Purchaser not less than ten (10) days prior to Settlement of the date and time that the Unit will be ready for inspection. Upon receipt of such notice, Purchaser shall promptly arrange for an appointment with a representative of Seller to make the pre-settlement inspection. At such inspection, the Pre-Settlement Inspection Form (the "Report") set forth as an exhibit hereto shall be completed and executed by Purchaser and by a representative of Seller. Purchaser shall attend such inspection and participate in the completion of the Report prior to Settlement. Seller shall complete, install or repair (as the case may be) any such "punch list" items noted on the Report within a reasonable time, but in no event shall the existence of any such items be a bar to Settlement or a ground to postpone Settlement beyond the time otherwise appointed in accordance with the terms of this Agreement, unless the Unit is rendered uninhabitable as a result of the deficiency(ies) noted in the Report, as determined by Seller in its reasonable discretion. At Settlement, no escrows for such items shall be established for any reason or under any circumstance whatsoever. Failure of Purchaser to arrange for a Pre-Settlement inspection within the aforementioned ten (10) day period or failure of Purchaser to keep the inspection appointment shall constitute full acceptance of the Unit by Purchaser. Upon acceptance of the deed by the Purchaser, Purchaser agrees to hold Seller free from liability for any visible defects not specifically noted in the Report; provided the terms detailed in the "Limited Condominium Warranty" will govern the limit of Seller's responsibility with respect to items covered by such warranty. After Settlement, Purchaser shall allow Seller adequate access to the Unit to remedy items noted on the Report during normal working hours and as mutually agreeable. The Report shall constitute Seller's warranty to Purchaser that any incomplete work will be performed as promptly as materials, weather and workload permit.

12

9.2    <u>Move-in / Move-out Policy.</u>    The Purchaser shall abide by the move-in / move-out policy for the Condominium as referenced in the Bylaws and/or the Rules and Regulations, and in accordance with the move-in schedule established by Seller. The Purchaser shall be responsible for any damage to the common areas of the Condominium building (including the elevators and hallways) and to the Unit resulting from the initial move-in after Settlement (whether by Purchaser, its invitees or tenants).  A move-in fee of $150.00 shall be payable for all move-ins, including the initial move-ins by the first occupants of the Unit (which amount shall be collected at Settlement from Purchaser).

10. WARRANTY.

10.1 At Settlement, Seller shall deliver to Purchaser an executed warranty in the form set forth in the "Limited Condominium Warranty" attached hereto as Exhibit "F".  Seller reserves the right at its option and at any time (either before or after the sale of a unit) to grant additional warranties with respect to any unit or the common elements.

11. RISKS.

11.1 The risk of loss or damage to the Unit by fire or other casualty is assumed by Seller until Settlement.  If such loss or damage occurs, Seller may terminate this Agreement and refund the Deposit and any advance paid for Options to Purchaser hereunder without further liability or obligation to Purchaser.  Purchaser shall have no right or claim to fire or other casualty insurance proceeds.

12. DEFAULT, SUBORDINATION, MERGER AND ASSIGNMENT.

12.1 Except as otherwise specifically provided herein, if Purchaser shall default in any of the payments or the timely performance of obligations called for in this Agreement, and fails to cure such default within the ten (10) days after written notice from Seller, then at the option of Seller, Purchaser shall forfeit any and all rights under this Agreement, and any amount theretofore paid under the terms of this Agreement may be retained by Seller as liquidated damages. It is acknowledged and agreed by Seller and Purchaser that the aforesaid liquidated damages are not a penalty, but represent the best and most reasonable estimate of the parties hereto of the actual damages which Seller shall sustain upon any default by Purchaser, which damages are not capable of precise determination.  If due to defects in title Seller shall be unable to deliver title in accordance with the provisions of this Agreement, Seller's liability shall be limited to the return of any payments made by Purchaser hereunder.

12.2 Purchaser's interest in this Agreement shall be subordinate to any lien placed by Seller against the Unit or the Condominium at any time prior to Settlement.  Purchaser agrees

13

to execute such further assurances of this covenant as may be required from time to time by Seller. Seller shall cause any such lien against the Unit to be released at or prior to Settlement, to the extent required by Paragraph 6 of this Agreement.

12.3 This Agreement shall be binding upon the parties hereto, and, as applicable, each of their respective heirs, personal representatives and successors.

12.4 This Agreement is personal to Purchaser and is not assignable by Purchaser either voluntarily, by operation of law, or otherwise. Seller may assign its rights hereunder in Seller's sole discretion.

13.     URBAN CONDITIONS.

13.1     Purchaser is purchasing the Unit subject to, and accepts all the risks associated with, conditions related to urban environments including, but not limited, to noise created by adjacent neighbors/property owners, bars, restaurants, nightclubs, construction, general street traffic, emergency vehicles, aircraft, general airport noise, noise and vibrations common in multi-dwelling buildings (from equipment such as, including but not limited to, exhaust fans and air condenser units) and other noise common in urban settings; common urban pests; vibrations from large vehicles such as waste removal vehicles, buses, metrorail trains and street cleaning equipment; odors including trash and other odors emanating from adjacent properties or other units in a multi-dwelling building, and, future development of surrounding property that may impact including, but not limited to, the light and air of the Unit and views from the Unit.

14.     SPECIFICATIONS.

14.1     Specifications for the Unit are listed and included with this Agreement as Exhibit "A" hereto (the "Specifications"). These Specifications include the appliances, finishes, and the general characteristics of the Unit. Seller reserves the right to substitute manufactured items or products in the Unit should sources become unavailable.

14.2     A conceptual sketch of the Unit is shown on Exhibit "B" attached hereto. This sketch generally delineates the rooms and layout of the Unit. The sketch is conceptual in nature and is not intended to be scaled for room dimensions. Final build-out of walls, ceilings, kitchen, baths, bedrooms, and specific features and details of the Unit may vary from the conceptual sketch due to construction constraints beyond the Seller's control or actual knowledge and Purchaser shall hold Seller harmless for such constraints on the final build-out of the Unit.

14



14.3  Furniture, wall coverings, window treatments, furnishings or the like as shown in or about any model unit, sales materials, renderings, or the Sales and Design Center are for display purposes only and are not considered a part of the Unit for the purposes of this Agreement. Further, the location of wall switches, thermostats, chases, exposed ductwork, exposed sprinkler lines and heads, vents, exposed plumbing lines, plumbing, electrical outlets, fireplaces (if applicable), and similar items may vary from unit to unit and may not be as shown in any model unit and any marketing materials. Any floor plans, sketches or sales drawings shown to Purchaser are for general illustrative purposes only and may not be in accordance with the final build-out of the Unit. The Unit is being sold unfurnished and will contain only the appliances and equipment installed at the time of inspection of the Unit by Purchaser, unless otherwise noted (including the appliances and equipment set forth in the Specifications). Seller will finish and equip the Unit only in accordance with the Specifications and Options selected by Purchaser for the Unit. Any scale model of the Unit or Condominium is only an artist's conception and is subject to change.

14.4  The Unit also will have unfinished concrete ceilings which may be characterized by markings such as, but not limited to, patches, plywood form imprints, small holes, cracks, written markings and stains. These characteristics of the concrete ceilings are not considered structural defects and will be conveyed to the Unit Owner "AS IS". Due to continuing changes in products, building codes and availability of materials, the Seller reserves the right to incorporate new design features or equivalent materials at any time without notice. Additionally, variations (such as color) occurring in Units or Common Areas of building materials and finishes, such as tile, granite, carpeting in Common Areas are not considered defects and will not be replaced by the Seller if variation occurs. This provision shall survive Settlement..

15. DISTRICT OF COLUMBIA SOIL DISCLOSURE REQUIREMENT.

15.1  Purchaser confirms that Seller has advised it, pursuant to Title 45, Section 308 of the District of Columbia Code, that the soil on the subject property on which the Condominium is located is noted in the Soil Survey of the District of Columbia as Urban Land underlain by sedimentary deposits. Purchaser has been advised that it may obtain further information in this regard by engaging a soil testing laboratory, the D.C. Department of Environmental Services, or the Soil Conservation Service of the U.S. Department of Agriculture. Nothing herein shall constitute a representation or warranty by Seller as to the soil characteristics of the subject property on which the Condominium is located.

15

16. UNDERGROUND STORAGE TANKS.

16.1 In accordance with the requirements of the D.C. Underground Storage Tank Management Act of 1990 as amended by the District of Columbia Underground Storage Tank Management Act of 1990 Amendment Act of 1992 (D.C. Code 6-995.1 et seq.) (the "Act") and the D.C. Underground Storage Tank Regulations, 20 DCMR Chapters 55-68 (the "Regulations"), Seller hereby informs Purchaser that Seller has no knowledge of the existence of an "underground storage tank" (as that term is defined in the Act and the Regulations) during the period of Seller's ownership. Seller shall provide an Underground Storage Tank Real Estate Transfer Disclosure Form at Settlement.

17. NOTICES.

17.1 All notices and demands required or given pursuant to the terms of this Agreement shall be in writing and served by certified  mail or personal delivery (including overnight courier) at the address of the Purchaser indicated below, or if to Seller:  PN Hoffman, Inc., 4725 Wisconsin Avenue, NW, Suite 200, Washington, DC 20016.

18. DESIGNATIONS AND CAPTIONS.

18.1 In any designation hereunder, reference to the masculine gender shall be deemed to included the feminine gender wherever same may be appropriate, and the plural shall be substituted for the singular or the singular substituted for the plural in any place herein in which the context may require substitution.

18.2 The captions contained in this Agreement are for convenience only and are not to be considered a material part hereof, and are not intended in any way to limit or enlarge the terms or provisions of this Agreement.

19. INITIAL OPERATING PERIOD.

19.1 During the "Declarant Control Period", at Seller's election (i) the Seller (as Declarant of the Condominium)  shall pay the costs of operating the Condominium and (ii) each Unit Owner, in lieu of an assessment against the units for Common Expenses and Residential Expenses, shall pay to Seller a fee in an amount equal to 90% of the units' estimated projected total monthly assessment for Residential Expenses and Common Expenses (or portion of a month on a pro rata basis) during the Declarant Control Period that the unit owner owns a unit. The Seller shall not be obligated to fund or otherwise contribute to any capital or other reserve fund for the Condominium during the Declarant Control Period.  "Declarant Control Period," as defined in the Bylaws, means the period of time commencing on the date that the Condominium

16



is created and ending on the date which is ninety (90) days after units to which 75% of the Percentage Interests appertain have been conveyed by Seller or, if later, two (2) years from the conveyance of the first unit, or on such earlier date as the Seller, in its sole discretion, may determine.

20.  AGREEMENT EXPRESSES ENTIRE UNDERSTANDING.

20.1  This Agreement together with the "Financial Information Sheet" completed by Purchaser and delivered to Seller constitute the entire agreement between the parties.  No representations, warranties, undertakings, promises, claims, advertising or promotional activities, made or conducted by Seller, or Seller's agents or sales representatives, whether oral, implied or otherwise, shall be binding upon Seller unless the same are expressly set forth in this Agreement or in a subsequent amendment, supplement or rider hereto executed by Seller.  All amendments, supplements or riders hereto, if any, shall be in writing and executed by both parties.

20.2  No representations or agreements with respect to modifications or changes in the Unit or Options required or requested by Purchaser, will be recognized unless such representations or agreements are in writing, signed by the parties hereto, and any required payments for such modifications, changes or Options are made at the time of the execution of such writing.

20.3  Unless oral statements or promises are reduced to writing and included in this Agreement, such statements or promises may not be enforceable under law.  By including the terms below, Purchaser and Seller are making them a part of this Agreement.  THIS PARAGRAPH SHOULD NOT BE LEFT BLANK IF YOU ARE RELYING ON ANY ORAL STATEMENTS OR PROMISES.

The following oral statements or promises have been made by Seller, Seller's agent, sales representatives, or Purchaser.  Performance of each of these statements or promises is incorporated into each party's obligation to fully perform the terms of this Agreement:



21.  COUNTERPARTS.

21.1  This Agreement may be executed in multiple counterparts, each of which, when so executed and taken together, may be considered an original.

17

22. Time of Essence.

    22.1 Time shall be considered of the essence in this Agreement.

23. Receipt of Public Offering Statement.

    23.1 Purchaser hereby acknowledges that s/he has received a copy of the Public Offering Statement, and exhibits thereto (including without limitation the Declaration of Condominium and Bylaws), for The Flats at Union Row, A Condominium (the "Public Offering Statement"). Purchaser hereby ratifies and agrees to be bound by the provisions of the foregoing documents, as each such document may be duly amended from time to time.

24. Access to Unit Prior to Settlement.

    24.1 In order to comply with insurance requirements and to assure the safety of Purchaser and Seller's personnel, Purchaser shall not have access or entry to the Unit, the Condominium building or the property on which the Condominium building is being constructed (the "Construction Site") during construction, nor may Purchaser store any of its possessions in or about the Unit or the Construction Site prior to Settlement of the Unit and delivery of possession to Purchaser hereunder. **PURCHASER ACKNOWLEDGES AND AGREES THAT ENTRY INTO THE UNIT OR THE CONSTRUCTION SITE WITH OR WITHOUT SELLER'S PERMISSION OR ACCOMPANIED OR UNACCOMPANIED BY SELLER'S SALES REPRESENTATIVES OR PERSONNEL, SHALL BE AT PURCHASER'S, ITS AGENTS', GUESTS', CONTRACTORS', INSPECTORS' AND INVITEES' SOLE AND EXCLUSIVE RISK AND PURCHASER HEREBY WAIVES ANY AND ALL CLAIMS FOR PERSONAL INJURY OR PROPERTY DAMAGE INCURRED BY PURCHASER, ON OR ABOUT THE UNIT OR CONSTRUCTION SITE WHETHER CAUSED BY SELLER, ITS REPRESENTATIVES OR PERSONNEL. PURCHASER FURTHER COVENANTS AND AGREES TO INDEMNIFY, DEFEND AND SAVE SELLER AND ITS REPRESENTATIVES AND PERSONNEL HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS FOR PERSONAL INJURY OR PROPERTY DAMAGE BROUGHT BY PURCHASER, OR ITS AGENTS, GUESTS, CONTRACTORS, INSPECTORS OR INVITEES.** Unauthorized access to the Unit or Construction Site shall be considered a trespass which may, at the election of Seller, be considered a material breach of this Agreement, and in addition to any other remedies available to Seller, Seller may declare this Agreement void, and, in such event, the Deposit herein provided, plus any amounts paid on account for Options, may be retained by Seller as fixed liquidated damages.

18



_____/_____ [Purchaser's initials]

24.2   Purchaser shall have three (3) opportunities to view the Unit prior to Settlement:  (1) at the orientation walkthrough to be scheduled by Seller prior to completion of the Unit, (2) at the pre-settlement inspection as set forth in Paragraph 9 herein upon substantial completion of the Unit, and (3) if necessary, one follow-up visit to the Unit following the pre-settlement inspection, but prior to Settlement on the Unit.  Purchaser hereby acknowledges that no other access or entry into the Unit will be granted to Purchaser other than as set forth under this Paragraph 24.2.  Purchaser has read this Paragraph 24.2 and agrees to adhere to the terms of Paragraph 24 hereof.

_____/_____ [Purchaser's initials]

25 . PURCHASER'S RIGHT TO CANCEL.

25.1.  Seller hereby grants to Purchaser a period of fifteen (15 ) days within which to review the Public Offering Statement made available to Purchaser pursuant to the Condominium Act and applicable regulations.  Notwithstanding any other provision of this Agreement to the contrary,  Purchaser, at his or her election, by written notice to the Seller or Seller's agent, sent by registered mail (or personal delivery to the Seller's or Seller's agent's office during business hours) at any time prior to midnight local time of the fifteenth (15th) day following the Effective Date, or receipt by Purchaser of a current Public Offering Statement, whichever is later, may terminate this Agreement, and thereupon the Purchaser's entire Deposit shall be refunded and the parties hereto shall have no further rights or liabilities under this Agreement.

25.2  PURCHASER'S RIGHT TO CANCEL [Spanish equivalent]

El vendedor permitira al comprado un periodo de 15 dias para revisar los documentos refderente a las leyes y regulaciones in el Distrito de Columbia.  No obstante cualquier otra provision de este acuerdo, el comprador, podra a su eleccion, responder al vendedor por medio de una carta registrada (o entregarlo personal mente a la oficina del vendedor durantre las horas del trabjo) en ecualquer momento antes de la medianoche del decimoquinto dia que sigue la fecha senalada en el contrato firmado por el comprado, o, que el comprado haya recibido un Anuncio de Oferta Publica corriente, lo que suceda ultimanmente, podra terminar el acuerdo, el comprador recibira su deposito y no habra ninguana obligacion entre las personas dentro de esta acuerdo.

25.3  If Purchaser terminates this Agreement pursuant to Paragraph 25 herein,

19

Purchaser shall return to Seller all copies of the Public Offering Statement and exhibits thereto, or pay to Seller the sum of $50.00 at such time, and the parties hereto shall execute a release of this Agreement.

    26. AGENCY.    CHECK IF APPLICABLE ☐

    The Seller agrees to pay to Purchaser's real estate salesperson (the "Agent") (if applicable), a commission in the amount as outlined in the "PN Hoffman Sales and Design Center Broker Registration" (the "Registration Form") attached as Exhibit D hereto, and distributed in accordance with the terms and conditions as set forth therein.  At Settlement on the Unit, said commission is hereby assigned to the Broker  as set forth on the Registration Form out of the proceeds of the sale of the Unit, and the settlement company is hereby authorized and directed to deduct the aforesaid commission from the proceeds of the sale and to make payment thereof directly to the Broker in accordance with a fully executed Registration Form.  In the event that that an Agent or Broker is not identified in the Registration Form, or the Registration Form is not fully executed, Purchaser shall indemnify Seller against the claim of any other broker, salesperson or sales agent claiming through Purchaser, including any attorney's fees incurred as a result of such claim.  In the event that Settlement on the Unit does not occur for any reason, Agent shall not be entitled to any commission and Purchaser shall indemnify Seller against any claim that the Agent may have to such commission, including attorney's fees incurred as a result of such claim.

    27.    PRIMARY RESIDENCE.

    PURCHASER HEREBY REPRESENTS AND WARRANTS THAT PURCHASER INTENDS TO OCCUPY THE CONDOMINIUM UNIT AS A PRIMARY RESIDENCE. ANY MISREPRESENTATION REGARDING PURCHASER'S INTENTION TO RESIDE IN THE CONDOMINIUM UNIT SHALL CONSTITUTE A DEFAULT BY PURCHASER PURSUANT TO PARAGRAPH 12 OF THIS AGREEMENT AND SHALL RESULT IN THE TERMINATION OF THIS AGREEMENT AND THE FORFEITURE OF PURCHASER'S DEPOSIT.

    _____/_____ [Purchaser's initials]

    28.    ARBITRATION.

    ANY DISPUTE, CONTROVERSY, OR CLAIM CONCERNING THE RIGHTS OR OBLIGATIONS OF THE PARTIES, INCLUDING, WITHOUT LIMITATION, ANY CONDITION OR ELEMENT OF THE UNIT, NEIGHBORHOOD OR NEARBY PROPERTY; THE NEED OR EFFECTIVENESS OF ANY REPAIR OR REPLACEMENT UNDER THE

LIMITED WARRANTY; OR ANY CLAIM OR MISREPRESENTATION, FRAUD, OR BREACH OF THIS AGREEMENT, SHALL BE SUBMITTED TO AND SETTLED BY BINDING ARBITRATION PURSUANT TO THE FEDERAL ARBITRATION ACT, TITLE 9 U.S.C. SELLER AND PURCHASER AGREE THAT SUCH ARBITRATION SHALL BE MANDATORY AND BINDING AND SHALL BE IN LIEU OF ANY OTHER LEGAL PROCESS OR REMEDY. ARBITRATION MAY BE REQUESTED BY EITHER PARTY AND SHALL BE CONDUCTED BY THE AMERICAN ARBITRATION ASSOCIATION ACCORDING TO ITS COMMERCIAL RULES. THE ARBITRATION SHALL AWARD ATTORNEY'S FEES, EXPERT WITNESS FEES, AND REASONABLE COSTS TO THE PARTY WHOSE POSITION IS UPHELD BY THE ARBITRATOR. SHOULD PURCHASER, IN VIOLATION OF THIS PARAGRAPH 28, COMMENCE LEGAL ACTION IN A COURT, SELLER SHALL HAVE THE RIGHT TO HAVE SUCH LEGAL ACTION DISMISSED AND TO RECOVER THE COST OF OBTAINING THE DISMISSAL. FURTHER, THE FILING OF ANY LEGAL ACTION IN VIOLATION OF THIS PARAGRAPH 28 SHALL NOT SERVE TO TOLL ANY STATUTE OF LIMITATIONS OR TIME PROVISION SET FORTH IN THIS AGREEMENT, THE LIMITED WARRANTY OR APPLICABLE LAW.

29.    MISCELLANEOUS.

The invalidity of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement. This Agreement and the rights and obligations of the parties hereunder shall be construed in accordance with the laws of the District of Columbia. With respect to the Condominium and abutting properties, Seller makes no representations, oral or written, concerning future land use and reserves the right to change or discontinue unit sales, models, or any portion of the property intended for the Condominium, or alter easements areas at any time without notice. Any checks accepted by Seller shall be subject to collection and payment. Seller has designated PN Hoffman, Inc., as its authorized sales representative, for the sale of units within the Condominium.

30.    ENVIRONMENTAL FACTORS.

30.1.    Seller makes no warranty, either express or implied, regarding the presence or absence of radon gas, asbestos, mold, lead in water, or any other hazardous substance or contaminant (collectively, "Environmental Materials"), in, at or in the vicinity of the Condominium or the Unit(s). Purchaser acknowledges that Seller shall not be liable for any damages related to the presence of any Environmental Materials in, at or in the vicinity of the Condominium or the Unit(s). By closing upon the Unit(s), Purchaser will be deemed to have released Seller from any and all claims and liabilities relating to or arising from the presence of Environmental Materials in, at or in the vicinity of the Condominium or the Unit(s), and from any and all responsibility for mitigating or remediating any Environmental Materials that may be

21

discovered in, at or in the vicinity of the Condominium or the Unit(s). Purchasers acknowledges that water supplied to the Condominium is provided by the DC Water and Sewer Authority (DCWASA), and that published reports have revealed the presence of lead in certain samples of drinking water supplied by DCWASA. Information on water supplied by DCWASA may be obtained from DCWASA, the District of Columbia Department of Health, the U.S. Environmental Protection Agency, and the U.S. Army Corps Washington Aqueduct. Purchaser acknowledges that Seller shall not be liable for any damages related to the condition of water in the Condominium or the Unit(s), including but not limited to the presence of lead in the water. This provision shall survive Settlement.

30.2    Mold, dust mites and pet dander are all naturally occurring substances that are all around us, in places that include work environments, outdoors, restaurants, and in the Purchaser's Condominium Unit. Seller and its employees are not experts on this topic, particularly with respect to mold, and to Seller's knowledge, medical, health science and building science professionals have not formed a consensus with respect to the effects of exposure to mold and similar substances. Because this topic is one for which Purchaser may have questions, Seller desires to provide to Purchaser some basic information gleaned from publicly available sources on the subject as well as the addresses of some websites where Purchaser can review such information in more depth. THE FOLLOWING IS NOT INTENDED TO BE A COMPREHENSIVE DISCUSSION OF THIS TOPIC AND IS BASED UPON DOCUMENTS FROM VARIOUS PUBLIC SOURCES. SELLER DOES NOT WARRANT THE ACCURACY OF THE INFORMATION HEREINBELOW PROVIDED.

(a) Molds are organisms found almost everywhere. Their growth requires a combination of moisture, an appropriate temperature, between 40° - 100° Fahrenheit and a food source such as paper, dirt, wood or leaves. Molds can be highly beneficial, benign and in some cases, with certain individuals, may give rise to concern of possible health effects, though there are presently no medical standards for exposure to molds. It is the Purchaser's responsibility to determine whether Purchaser or a member of Purchaser's household may have sensitivities to mold. Purchaser shall be solely responsible for monitoring Purchaser's Condominium Unit for possible contaminants such as mold.

(b) Mold naturally occurs in any indoor environment. The U.S. Environmental Protection Agency's Air Quality Website, "Mold Resources," states that, "There is no practical way to eliminate all mold and mold spores in the indoor environment; the way to control indoor mold growth is to control "moisture." Mold can enter a condominium unit through doors, windows, people, pets and HVAC systems. As such, it is not possible to prevent mold from entering Purchaser's Unit.

22

(c)  Governmental and non-governmental organizations have made suggestions of steps individuals, such as Purchaser, can take to control the potential for the growth of mold and other indoor contaminants in Purchaser's Condominium Unit.  The following are merely suggestions and do not constitute an all-inclusive list:

(i) Use air conditioners and dehumidifiers properly, and clean and empty the dehumidifiers daily;

(ii) Vacuum and clean regularly, using a mold-killing product in bathrooms;

(iii) Check the seal around the doors of Purchaser's refrigerator and freezer to make sure they are sealed properly and follow the manufacturer's procedures to clean the drip pans;

(iv) Address any leaks immediately; and

(v) Take immediate action if Purchaser detects signs of moisture or mold. Moisture should be immediately dried to prevent mold growth and Purchaser should clean any mold growth by washing off hard surfaces with detergent and water followed by complete drying of the surface.  Mold not promptly and property addressed may reoccur and/or spread.

(d)  The following websites are just a few of the many available to Purchaser where additional information can be obtained:

US Environmental Protection Agency – http://www.epa.gov
Centers for Disease Control and Prevention – http://www.cdc.gov

(e)  In the event that moisture arises from a cause covered under the statutory condominium warranty (the "Warranty"), Purchaser MUST IMMEDIATELY contact Seller so that appropriate investigation and action can be taken.  If the warranty period has lapsed or the Warranty does not cover the item(s), then Purchaser should take immediate action to have the problem addressed.  Seller shall not be responsible for, and Purchaser expressly agrees to indemnify and hold Seller harmless from, any water/moisture related damages, including but not limited to personal injury or property damage caused by mold to the extent these damages:

(i)  are caused by Purchaser's negligence;

(ii)  are caused or made worse by Purchaser's failure to immediately take necessary remedial actions and minimize damage caused by the water/moisture; or

23



(iii) are caused by Purchaser's failure to immediately notify Seller of a water/moisture problem potentially covered under the Limited Warranty and Purchaser not permitting Seller access to the Purchaser's Unit to address the problem and take the remediation steps deemed necessary, if any, by Seller in its sole discretion.

(f) PURCHASER ACKNOWLEDGES THAT PURCHASER HAS RECEIVED, READ AND UNDERSTANDS THE INFORMATION, WAIVERS AND RECOMMENDATIONS IN THIS PARAGRAPH 30.2.

31. REPURCHASE RIGHT.

31.1    Purchaser hereby represents to Seller that Purchaser is purchasing the Unit as his/her primary, year round residence and does not intend to sell the Unit for a period of at least twelve (12) months from the date of Settlement. In order to induce Seller to sell the Unit to Purchaser, Purchaser agrees that the deed of conveyance from Seller conveying the Unit to Purchaser may, at the sole and exclusive option of Seller, contain an express reservation in favor of the Seller (the "Repurchase Reservation") reserving unto the Seller the right, but not the obligation, to repurchase from the Purchaser the Unit on the terms and conditions set forth below in the event that Purchaser shall attempt to sell the Unit during the period that is twelve (12) months from the Settlement (the "Repurchase Period").

In the event that Purchaser wishes to convey the Unit during the Repurchase Period, the Purchaser shall be obligated first to notify Seller in writing and Seller shall for a period of fifteen (15) days following its receipt of such written notice have the right (but not the obligation) to repurchase from the Purchaser the Unit at the same purchase price paid by Purchaser pursuant to this Purchase Agreement (the "Repurchase Right"). In the event Seller shall exercise its Repurchase Right, Seller shall thereafter be obligated to proceed to closing on the Unit within thirty (30) days following notification to Purchaser by the Seller of its exercise of the Repurchase Right. Should Seller exercise its Repurchase Right, Purchaser shall be obligated to convey to Declarant good and marketable title by special warranty deed and free of liens and encumbrances, and subject only to those title matters as to which Purchaser took subject to on the date of Settlement. The Unit shall also be vacant at the time of settlement, and substantially in the same physical condition as when delivered to Purchaser at Settlement. The Seller shall be obligated to pay for all recording costs and other settlement costs in connection with its repurchase of the Unit, provided Purchaser shall pay the District of Columbia Transfer Tax (1.1% as the Effective Date). Closing on the repurchase shall occur at the office of a title insurance company designated in writing by Seller. Real estate taxes and Condominium assessments shall be adjusted and prorated to the date of the settlement on the repurchase. If Seller elects not to exercise its Repurchase Right or fails to exercise its Repurchase Right within

24

the time frame specified in this Paragraph, Purchaser shall be free to convey the Unit to a third party. Notwithstanding anything to the contrary contained in the Purchase Agreement, the provisions of this Paragraph 31 shall survive Settlement, and the Repurchase Right may be specifically set forth in the deed of conveyance for the Unit.

The Repurchase Right shall be subordinate to the rights of any bona fide lending institution making a first deed of trust loan secured by the Unit to Purchaser hereunder and any such deed of trust lender shall take title free of all rights of repurchase in favor of Seller in the event of any foreclosure or deed in lieu of foreclosure.

[SIGNATURE PAGE TO FOLLOW.]

25



IN WITNESS WHEREOF, the parties have executed this Agreement this __11__ day of __MAY__ , 2005.

Purchaser's Address:

_851 N. GLEBE RD #1521_
_ARLINGTON, VA, 22203_

PURCHASER(s):

_____
(Purchaser's Signature)

Date: _5 - 11 - 05_

Telephone No. _703 - 243 - 2254_       _703 - 593 - 6313_
        Home                    Office

Email address: _omidrokni@yahoo.com_

SELLER:

PNH UNION SQUARE L.L.C.,
a Delaware limited liability company

By: _____ _5/13/05_
        PN Hoffman Realty, Inc.,
        Authorized Agent

**NOTWITHSTANDING THE DELIVERY OF A DEPOSIT, AND SELLER'S SALES REPRESENTATIVES ACKNOWLEDGING WRITTEN RECEIPT THEREOF, THIS AGREEMENT IS NOT BINDING UPON SELLER UNTIL ACCEPTED IN WRITING BY SELLER.**

26

## RECEIPT OF PUBLIC OFFERING STATEMENT

The undersigned acknowledge(s) that I (we) have received a Public Offering Statement for THE FLATS AT UNION ROW CONDOMINIUM, 2125 14th Street, N.W., Washington, D.C. 20005.

Date: 5-11-05                      _____
                                        Purchaser

27



**LIST OF EXHIBITS TO THE PURCHASE AGREEMENT**

EXHIBIT A - UNIT SPECIFICATIONS
EXHIBIT B - CONCEPTUAL SKETCH OF THE UNIT
EXHIBIT C - CHANGE ORDER ADDENDUM
EXHIBIT D - SALES AND DESIGN CENTER BROKER REGISTRATION FORM [IF APPLICABLE]
EXHIBIT E - PRE-SETTLEMENT INSPECTION REPORT
EXHIBIT F - LIMITED CONDOMINIUM WARRANTY

28



G-3 LEVEL PARKING

F i n e    U r b a n    L i v i n g ™

**UNION ROW**

DEN

W/D

BATH

KITCHEN

BATH

A/C

W/C

**Unit 313**

MASTER BEDROOM

LIVING / DINING ROOM



All dimensions and square footage are approximate. Floor plans, specifications and amenities are subject to modifications and improvements without notice. Renderings and furniture are an artist's representation for illustrative purposes only.

AMIN ROKNI        05-99
FAYE ROKNI
9706 DAYS FARM DR.
VIENNA, VA  22182-7302                              Date 5/11/05                388
                                                                    68-1/510 VA
                                                                        1656

Pay to the
order of    PAH UNION SQUARE ESCROW          $ 10,920. 00

Ten Thousand Nine Hundred Twenty Dollars & 00/100 Dollars

Bank of America

ACH R/T 051000017

For  PARKing SPACES Deposits

⑈051000017⑈ 00411720338⑈ 0388

306 - 313 - 316 - 413

$ 2,940 is for Unit # 313
Parking deposit

OMID ROKNI
9706 DAYS FARM DR.
VIENNA, VA 22182

309

68-790/560
BRANCH 97256

Pay to the
order of: LN Hoffman Escrow

$ 29,043.00

Twenty Nine Thousand and forty three — — — Dollars

Date 9/23/04

WACHOVIA
Wachovia Bank, N.A.
wachovia.com

For  Escrow # 313    Union Square

⑆056007804⑈ 105000 280088 22⑈ 0309

| Form **W-9** (Rev. January 2005) Department of the Treasury Internal Revenue Service | **Request for Taxpayer Identification Number and Certification** | Give form to the requester. Do not send to the IRS. |
|---|---|---|

Name (as shown on your income tax return)
**OMID ROKNI**

Business name, if different from above

Check appropriate box: ☒ Individual/ Sole proprietor  ☐ Corporation  ☐ Partnership  ☐ Other ▶ .................  ☐ Exempt from backup withholding

Address (number, street, and apt. or suite no.)
**851 N. GLEBE RD # 1521**

Requester's name and address (optional)

City, state, and ZIP code
**ARLINGTON VA 22203**

List account number(s) here (optional)

*Print or type    See Specific Instructions on page 2.*

### Part I    Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on Line 1 to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see *How to get a TIN* on page 3.

**Note.** *If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.*

Social security number
**2 2 3 3 9 5 7 6 3**

or

Employer identification number

### Part II    Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. person (including a U.S. resident alien).

Certification instructions. You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the Certification, but you must provide your correct TIN. (See the instructions on page 4.)

**Sign Here**    Signature of U.S. person ▶    Date ▶ **5-11-05**

## Purpose of Form

A person who is required to file an information return with the IRS, must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

**U.S. person.** Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee.

**Note.** *If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.*

For federal tax purposes you are considered a person if you are:

● An individual who is a citizen or resident of the United States,

● A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States, or

● Any estate (other than a foreign estate) or trust. See Regulations sections 301.7701-6(a) and 7(a) for additional information.

**Foreign person.** If you are a foreign person, do not use Form W-9. Instead, use the appropriate Form W-8 (see Publication 515, Withholding of Tax on Nonresident Aliens and Foreign Entities).

**Nonresident alien who becomes a resident alien.** Generally, only a nonresident alien individual may use the terms of a tax treaty to reduce or eliminate U.S. tax on certain types of income. However, most tax treaties contain a provision known as a "saving clause." Exceptions specified in the saving clause may permit an exemption from tax to continue for certain types of income even after the recipient has otherwise become a U.S. resident alien for tax purposes.

If you are a U.S. resident alien who is relying on an exception contained in the saving clause of a tax treaty to claim an exemption from U.S. tax on certain types of income, you must attach a statement to Form W-9 that specifies the following five items:

1. The treaty country. Generally, this must be the same treaty under which you claimed exemption from tax as a nonresident alien.

2. The treaty article addressing the income.

3. The article number (or location) in the tax treaty that contains the saving clause and its exceptions.

Cat. No. 10231X    Form **W-9** (Rev. 1-2005)



313



Wells Fargo Home Mortgage
12701 Fair Lakes Circle #275
Fairfax, Va. 22033
(703) 803-3500

## LOAN APPROVAL

05/10/05

Omid Rokni
851 N. Glebe Road #1521
Alrington, VA 22203

Dear Mr. Rokni,

Congratulations!!! You have been approved to purchase a condominium in
Washington, DC. with a maximum sales price of $420,000. You have been
qualified with a 10% down payment and an interest rate of 7.5% on a 10/1 ARM
with principal and interest.

We will need a satisfactory appraisal and satisfactory ratified sales contract.

We will need the standard closing documentation such as title ins., hazard ins., etc.

Please do not open any significant credit accounts such as mortgages, car loans,
boat loans, etc. because it could jeopardize your approval. If you are considering new
credit feel free to give me a call.

Please call me at (800) 669-7215 with any questions.

Sincerely,

*W. Scott Hawkins*

W. Scott Hawkins
Home Mortgage Consultant

FINANCIAL INFORMATION SHEET

This information is presented with the understanding that the seller may use it as a basis for the acceptance of a contract. The undersigned hereby authorizes the agent to disclose to the seller, cooperating brokers and any lender all or any portion of the information contained in this financial information sheet. Any misrepresentations fraudulent entries and/or omissions on this form may be used as a basis for legal action.

Purchaser (Full Name) OMID ROKNI          Age 25   Soc. Sec.# 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
Residence Phone 703-593-6213   Business Phone SAME   E-mail OMIDROKNI@YAHOO.com
Present Address 851 N. GLEBE RD #1521   ARLINGTON VA 22203
Years at Present Address 1   Own $ 2,000   PITI or Rent $_____ Per Month
Marital Status: ☐ Married  ☑ Unmarried (Including single, divorced or widowed)
Occupation (Position & Title) SALES          # of Years 5
Place of Employment (Name & Address) ORACLE CORPORATION & CHASE REAL PROPERTIES

Co-Purchaser (Full Name)_____
Residence Phone_____ Business Phone_____   Age_____ Soc. Sec.#_____
Present Address_____
Years at Present Address_____ Own $_____   PITI or Rent $_____ Per Month
Marital Status: ☐ Married  ☐ Unmarried (Including single, divorced or widowed)
Occupation (Position & Title)_____   # of Years_____
Place of Employment (Name & Address)_____

GROSS ANNUAL INCOME:

|  | Purchaser | Co-Purchaser |  |
|---|---|---|---|
| Base Salary: | $ 50 K | $_____ | Purchaser self-employed? ☐ Yes ☐ No   ☑ BOTH |
| Commissions/Bonus: | $ 100 K | $_____ | Co-Purchaser self-employed? ☐ Yes ☐ No |
| Dividends: | $ 10 K | $_____ | Do you intend to occupy this property? |
| Other:_____ | $_____ | $_____ | ☑ Yes ☐ No |
| _____ | $_____ | $_____ | Number of children 0 Ages_____ |
| TOTAL: | $ 0.00 160K | $ 0.00 | Other dependents_____ |

ASSETS:
Checking:  $ 5 K   Bank WACHOVIA
Savings:   $ 25 K   Bank WACHOVIA
Credit Union: $_____   Bank_____
Stocks:    $ 20 K   Bonds $_____   Life Insurance-Cash Value $_____   Face Value $_____
Present Residence (if owned): Mkt. value $ 500K   Mtge. Balance $ 300 K   Lender BB&T
Other Assets: (Specify)_____

LIABILITIES: (List outstanding obligations including auto loans, mortgage payments, credit cards personal loans and all other loans.)

| Type | Creditor's Name | Unpaid Balance | Payoff Date | # of Payments Remaining | Monthly Payment |
|---|---|---|---|---|---|
| MORTGAGE | OMID ROKNI | $ 300 K | 2020 | 300 | $ 2 K |
|  |  | $_____ |  |  | $_____ |
|  | TOTAL | $ 0.00 |  |  | $0.00 |

Additional Monthly Obligations (if any)_____

Have you ever declared bankruptcy? ☐ Yes ☑ No   If yes, explain_____

Are there any outstanding judgments, lawsuits or tax liens current: ☐ Yes  ☑ No   Amount $_____
If yes, explain_____

Are you aware of any factors or conditions that could adversely affect your ability to obtain a mortgage loan? ☐ Yes ☑ No
If yes, use reverse side for details.

Is any part of the down payment or settlement costs being obtained from a source other than from assets listed above: ☐ Yes ☑ No
If yes, provide source_____

I (we) certify that the above information is true and accurate to the best of my (our) knowledge and by my (our) signature(s) acknowledge receipt of a copy of this financial information sheet.

Purchaser_____   Co-Purchaser_____

Date 5-11-05                          Date_____

## NON-BINDING RESERVATION AGREEMENT

For and in consideration of the sum of _Twenty nine thousand forty three dollars_ ($ _29,043_ ) (the "Deposit"), receipt of which is hereby acknowledged, PNH Union Square L.L.C. (the "Seller"), hereby grants to _____ Omid Rokni _____ (the "Prospective Purchaser") the right to purchase the Condominium Unit identified as Unit No. _313_ (the "Unit") in the condominium project to be known as Union Square Condominium (the "Condominium"), at a sales price of _Four hundred fourteen thousand nine hundred_ ($ _414,900_ ) (such sales price is <u>exclusive</u> of any purchase price for a parking or storage space, if applicable).

1.    In the event that either party hereto cancels this Reservation Agreement pursuant to Paragraph 2 below, the Deposit shall be returned immediately to the Prospective Purchaser.

2.    This Reservation Agreement may be canceled (a) by the Prospective Purchaser, at the sole option of the Prospective Purchaser, at any time before entering into a formal purchase contract for the Unit (the "Purchase Agreement"), by written notice of such cancellation to the Seller, or (b) by the Seller, by written notice, if the Prospective Purchaser does not enter into a Purchase Agreement within ten (10) business days after written notice is sent to the Prospective Purchaser that the Purchase Agreement is prepared, or (c) by the Seller upon giving notice to the Prospective Purchaser of the Seller's intention to abandon its plan to construct the Condominium.

3.    Prospective Purchaser is advised that, as of the date of this Reservation Agreement, Seller does not own legal title to the property on which the Condominium is intended to be constructed (the "Property"), but rather, Seller is the contract purchaser of such Property. Seller anticipates closing on the Property on or before November 30, 2004. In the event that Seller does not close on the Property by November 30, 2004, this Reservation Agreement shall remain valid until either a Purchase Agreement is entered into by the parties hereto, or notice of cancellation is provided by either party pursuant to paragraph 2 above.

4.    This Reservation Agreement shall be void (a) in the event of cancellation pursuant to the terms of Paragraph 2 above, or (b) at such time as the Prospective Purchaser and the Seller enter into a Purchase Agreement. In the event that the Seller and the Prospective Purchaser enter into such Purchase Agreement, the Deposit given hereunder shall be credited toward any deposit required by such Purchase Agreement and the rights and obligations of the parties hereto shall be governed by the terms of such contract. It is expressly agreed and understood between the parties hereto that the Prospective Purchaser is not obligated hereunder to purchase the Unit.

5.    All notices required or permitted to be given hereunder shall be in writing and delivered personally by mail and/or email to the parties at the addresses indicated below. This Reservation Agreement cannot be assigned by the Prospective Purchaser.

6.    Cooperative broker fee is not applicable to the purchase of the Unit.

7.    Prospective Purchaser shall receive a $7,500.00 credit at settlement on the Unit for attending the Friends and Family event. _10,000.00_

NOTWITHSTANDING ANY PROVISION CONTAINED HEREIN TO THE CONTRARY, THE PROSPECTIVE PURCHASER ACKNOWLEDGES THAT THIS RESERVATION AGREEMENT IS NOT A CONTRACT, AGREEMENT OR BINDING OBLIGATION TO PURCHASE THE UNIT, AS SUCH MAY ONLY BE MADE IN ACCORDANCE WITH APPLICABLE LAW.

PROSPECTIVE PURCHASER:

_____ (SEAL)           _____ (SEAL)
Soc. Sec. # _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_                 Soc. Sec. # _____
Date: _9-23-04_                           Date: _____

Address:

_88xxxxx_ _9706 DAYS FARM DR._
_VIENNA, VA 22182_

E-mail: _OMIDROKNI@ Yahoo.com_
Phone #: _703-243-2254_
Cell#: _703-593-6313_
Fax#: _____

SELLER:

PNH Union Square L.L.C.

        By: PN Hoffman Realty, Inc., Authorized Agent

        By: _____
            S. Mark Stahl, Senior Vice President

Address to which notices to the
Seller shall be sent:

PN Hoffman Realty, Inc.
1425 P Street, NW, Suite #608
Washington, DC 20005

Dated: _____

**PLEASE MAKE CHECKS PAYABLE TO PN HOFFMAN ESCROW**

2

L&B 379897v2/05817.0005

SEP 16 2004 15:13 FR FIRST EQUITABLE    703 642 6671 TO 2022328972    P.02/02
Case 1:07-cv-01474-RJL    Document 1-2    Filed 08/16/2007    Page 49 of 49

313



09/16/2004

To Whom It May Concern:

This will confirm that Mr. Omid Rokni has loan application with First Equitable
Mortgage corp. Based on his credit reports and the information provided the purchaser
is approved for the requested loan amount of $450,000.00

This approval is subject to a satisfactory appraisal. This approval is based on today's
Market interest rate.

If I can be of further assistance, please do not hesitate to contact me.

Sincerely,

Susan Soh
Senior Loan Officer
Tel: 703-642-6646 Ext: 303
Fax: 703-642-6671

P.O. Box 1511 • 7611 Little River Turnpike • Suite 300 West Wing • Annandale, VA 22003 • Tel: (703) 642-6646 • Fax: (703) 642-6671

JS-44
(Rev.1/05 DC)

**CIVIL COVER SHEET**

| **I. (a) PLAINTIFFS** | **DEFENDANTS** |
|---|---|

OMID ROKNI, et al

PNH UNION SQUARE LLC

(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT    Washington, DC
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF
LAND INVOLVED

(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Howard R Shmuckler
Law Offices HR Shmuckler
1700 Pennsylvania Ave. NW, Suite 400
Washington, DC 20006-4707
(202) 349-4034

Case: 1:07-cv-01474
Assigned To : Leon, Richard J.
Assign. Date : 8/16/2007
Description: General Civil

JURY ACTION

---

**II. BASIS OF JURISDICTION**
(PLACE AN x IN ONE BOX ONLY)

○ 1 U.S. Government
  Plaintiff

◉ 3 Federal Question
  (U.S. Government Not a Party)

○ 2 U.S. Government
  Defendant

○ 4 Diversity
  (Indicate Citizenship of
  Parties in item III)

**III CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ○ 1 | ○ 1 | Incorporated or Principal Place of Business in This State | ○ 4 | ○ 4 |
| Citizen of Another State | ○ 2 | ○ 2 | Incorporated and Principal Place of Business in Another State | ○ 5 | ○ 5 |
| Citizen or Subject of a Foreign Country | ○ 3 | ○ 3 | Foreign Nation | ○ 6 | ○ 6 |

---

**IV. CASE ASSIGNMENT AND NATURE OF SUIT**
(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)

| ○ A. *Antitrust* | ○ B. *Personal Injury/ Malpractice* | ○ C. *Administrative Agency Review* | ○ D. *Temporary Restraining Order/Preliminary Injunction* |
|---|---|---|---|
| ☐ 410 Antitrust | ☐ 310 Airplane<br>☐ 315 Airplane Product Liability<br>☐ 320 Assault, Libel & Slander<br>☐ 330 Federal Employers Liability<br>☐ 340 Marine<br>☐ 345 Marine Product Liability<br>☐ 350 Motor Vehicle<br>☐ 355 Motor Vehicle Product Liability<br>☐ 360 Other Personal Injury<br>☐ 362 Medical Malpractice<br>☐ 365 Product Liability<br>☐ 368 Asbestos Product Liability | ☐ 151 Medicare Act<br><br>**Social Security:**<br>☐ 861 HIA ((1395ff)<br>☐ 862 Black Lung (923)<br>☐ 863 DIWC/DIWW (405(g)<br>☐ 864 SSID Title XVI<br>☐ 865 RSI (405(g)<br>**Other Statutes**<br>☐ 891 Agricultural Acts<br>☐ 892 Economic Stabilization Act<br>☐ 893 Environmental Matters<br>☐ 894 Energy Allocation Act<br>☐ 890 Other Statutory Actions (If Administrative Agency is Involved) | Any nature of suit from any category may be selected for this category of case assignment.<br><br>*(If Antitrust, then A governs)* |

| ☒ E. *General Civil (Other)* | OR | ○ F. *Pro Se General Civil* |
|---|---|---|

| **Real Property**<br>☐ 210 Land Condemnation<br>☐ 220 Foreclosure<br>☐ 230 Rent, Lease & Ejectment<br>☐ 240 Torts to Land<br>☐ 245 Tort Product Liability<br>☒ 290 All Other Real Property<br><br>**Personal Property**<br>☐ 370 Other Fraud<br>☐ 371 Truth in Lending<br>☐ 380 Other Personal Property Damage<br>☐ 385 Property Damage Product Liability | **Bankruptcy**<br>☐ 422 Appeal 28 USC 158<br>☐ 423 Withdrawal 28 USC 157<br><br>**Prisoner Petitions**<br>☐ 535 Death Penalty<br>☐ 540 Mandamus & Other<br>☐ 550 Civil Rights<br>☐ 555 Prison Condition<br><br>**Property Rights**<br>☐ 820 Copyrights<br>☐ 830 Patent<br>☐ 840 Trademark<br><br>**Federal Tax Suits**<br>☐ 870 Taxes (US plaintiff or defendant)<br>☐ 871 IRS-Third Party 26 USC 7609 | **Forfeiture/Penalty**<br>☐ 610 Agriculture<br>☐ 620 Other Food &Drug<br>☐ 625 Drug Related Seizure of Property 21 USC 881<br>☐ 630 Liquor Laws<br>☐ 640 RR & Truck<br>☐ 650 Airline Regs<br>☐ 660 Occupational Safety/Health<br>☐ 690 Other<br><br>**Other Statutes**<br>☐ 400 State Reapportionment<br>☐ 430 Banks & Banking<br>☐ 450 Commerce/ICC Rates/etc.<br>☐ 460 Deportation | ☐ 470 Racketeer Influenced & Corrupt Organizations<br>☐ 480 Consumer Credit<br>☐ 490 Cable/Satellite TV<br>☐ 810 Selective Service<br>☐ 850 Securities/Commodities/ Exchange<br>☐ 875 Customer Challenge 12 USC 3410<br>☐ 900 Appeal of fee determination under equal access to Justice<br>☐ 950 Constitutionality of State Statutes<br>☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act |

| ○ **G. Habeas Corpus/ 2255** | ○ **H. Employment Discrimination** | ○ **I. FOIA/PRIVACY ACT** | ○ **J. Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General<br>☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | ☐ 895 Freedom of Information Act<br>☐ 890 Other Statutory Actions (if Privacy Act)<br><br><br>*(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ○ **K. Labor/ERISA (non-employment)** | ○ **L. Other Civil Rights (non-employment)** | ○ **M. Contract** | ○ **N. Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act<br>☐ 720 Labor/Mgmt. Relations<br>☐ 730 Labor/Mgmt. Reporting & Disclosure Act<br>☐ 740 Labor Railway Act<br>☐ 790 Other Labor Litigation<br>☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act)<br>☐ 443 Housing/Accommodations<br>☐ 444 Welfare<br>☐ 440 Other Civil Rights<br>☐ 445 American w/Disabilities-Employment<br>☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance<br>☐ 120 Marine<br>☐ 130 Miller Act<br>☐ 140 Negotiable Instrument<br>☐ 150 Recovery of Overpayment & Enforcement of Judgment<br>☐ 153 Recovery of Overpayment of Veteran's Benefits<br>☐ 160 Stockholder's Suits<br>☐ 190 Other Contracts<br>☐ 195 Contract Product Liability<br>☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

◉ 1 Original Proceeding  ○ 2 Removed from State Court  ○ 3 Remanded from Appellate Court  ○ 4 Reinstated or Reopened  ○ 5 Transferred from another district (specify)  ○ 6 Multi district Litigation  ○ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

15 U.S.C. 1701, et seq.: Defendant violation of prohibited acts under Interstate Land Sales Act

| **VII. REQUESTED IN COMPLAINT** | CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23 | **DEMAND $** _ _ _ _ _ _ _ _ **JURY DEMAND:** | Check YES only if demanded in complaint YES ☒  NO ☐ |
|---|---|---|---|

**VIII. RELATED CASE(S) IF ANY**  (See instruction)  YES ☐  NO ☒  If yes, please complete related case form.

DATE  August 16, 2007    SIGNATURE OF ATTORNEY OF RECORD  *Howard R. Rubuckelli*

---

## INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44
### Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.