# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
:
**OMID ROKNI, et al.**                          :
:
         **Plaintiffs,**                        :
:
**v.**                                          :        **Case No. 1:07-cv-01474 -RJL**
:
**PNH UNION SQUARE L.L.C.**                     :
:
         **Defendant.**                         :
:
_____:

## REPLY IN SUPPORT OF MOTION TO COMPEL ARBITRATION AND DISMISS COMPLAINT, OR, IN THE ALTERNATIVE, STAY PROCEEDINGS PENDING ARBITRATION

Having failed to timely respond to Defendant's Motion to Compel Arbitration and Dismiss Complaint, Or, In The Alternative, Stay Proceedings Pending Arbitration ("Motion to Compel"), Plaintiffs now oppose arbitration on grounds that are (1) unsupported by the contract between the parties and (2) unsupported by the controlling authority and policy that favors arbitration. As such, the Motion to Compel should be granted, and Plaintiffs' lawsuit should be dismissed. Plaintiffs should be compelled to arbitrate any dispute they have with Defendant.

As an initial matter, Plaintiffs provide absolutely no explanation or excuse for the untimely nature of their Opposition. LCvR 7 dictates that a party has 11 days to timely respond to a motion. Failing that, the Court has absolute discretion to treat any unopposed motion as conceded. Here, Plaintiffs' response to Defendant's Motion to Compel was due on September 24, 2007. Plaintiffs filed their Opposition on December 5, 2007 – more than 70 days late – with no explanation or justification for the delay. This Court should simply treat the Motion to Compel as conceded, and dismiss Plaintiffs' Complaint.

Nonetheless, even if the Court were to consider the merits of Plaintiffs' Opposition, the Court should find that Plaintiffs' Opposition wholly fails to advance any plausible argument in opposition to the Defendant's Motion to Compel.  First, Defendant has not breached § 7.6 of the Purchase Agreement, the provision that Plaintiffs suggest gives rise to their right to bring an action in court.  Plaintiffs do not allege and cannot show that Defendant failed to complete construction of the condominium units in the time stated in each Purchase Agreement.[1]  Indeed, Defendant sent notices to Plaintiffs informing each of the completion of his/her unit in the appropriate time limitations under each Purchase Agreement and Defendant's readiness to attend settlement.  *See* Motion to Compel at p. 4 n. 4.  Because § 7.6 provides that Plaintiffs may pursue "any remedies available under applicable law" **only** if Defendant failed to complete construction in the time stated in the Purchase Agreement, Plaintiffs cannot invoke that provision in an attempt to avoid the arbitration provision in § 28 of the Purchase Agreement.  Plaintiffs did not raise this allegation in their Complaint because it simply isn't true – Defendant has complied with the construction timeframe required under their respective Purchase Agreements, and the only reason settlement has not occurred on any unit is because Plaintiffs have failed to comply with their obligations under each Purchase Agreement.

Second, even if Defendant breached § 7.6 (or any other aspect of the Purchase Agreement), Plaintiffs argument that the Purchase Agreement provides for alternate forums (*see* Opposition at p. 2) is flatly wrong.  Nowhere does the Purchase Agreement state that Plaintiffs

---

[1] Plaintiffs state in their Opposition that "Seller agrees and obligates itself to complete construction of the property no later than twenty-four months following the date of this Agreement."  *See* Opposition at p. 2.  In ¶ 9 of their Complaint, Plaintiffs state, "[a]ll Plaintiffs' Agreements are similar in every respect with the only exceptions being, the unit number, unit price and deposit tendered."  Both the Opposition and the Complaint are incorrect.  Plaintiffs' Purchase Agreements differ in the amount of months that Defendant had to complete construction of the units.  In some Purchase Agreements, Defendant had 24 months to complete construction (such as the agreement for Plaintiff Poopak Taati, which is attached to the Complaint), while in others, Defendant had 36 months.  *See e.g.* Purchase Agreement for Omid Rokni attached hereto as *Exhibit A*.

may pursue "any available remedy" in any forum except in arbitration. The Purchase Agreement speaks only to Plaintiffs' remedy options and does not purport to speak to the forum within which Plaintiffs may pursue that remedy. *See* Purchase Agreement at §7.6(a). Section 7.6(a) mentions the arbitration provision only to make clear that upon Defendant's breach, Plaintiffs' remedies are not limited to the ones enumerated in § 7.6(a) or in the arbitration provision.[2] To be clear, the only section of the Purchase Agreement that speaks to forum is the arbitration provision, which dictates that the parties must submit "any dispute, controversy, or claim concerning the rights or obligations of the parties… [to] binding arbitration." *See* Purchase Agreement at § 28. To the extent Plaintiffs suggest that arbitration would limit the remedy that Plaintiffs may pursue (s*ee* Opposition at p. 4), such a position must be rejected because federal caselaw does not support it. *See Cole v. Burns Intern. Securities Serv.*, 105 F.3d 1465, 1480 (D.D.C. 1997) (citing Rule 32(c) of the AAA, which states, "the arbitrator may grant any remedy or relief that the arbitrator deems just and equitable, including, but not limited to, any remedy or relief that would have been available to the parties had the matter been heard in court").[3] The *Cole* court held the arbitration agreement at issue valid because, among other things, the agreement allowed for all of the types of relief that would be available in court, and did not seek to limit any remedies otherwise available. *See id.* at 1482.

Finally, Plaintiffs seem to contend that Defendant breached the Purchase Agreement because the Arbitration Agreement is unconscionable and violates the District of Columbia Consumer Protection Act ("DCCPA") and the federal Interstate Land Sales Act ("ILSA"). *See*

---

[2] Read carefully, it is clear that § 7.6(a) delineates two specific remedies that Plaintiffs have and then goes on to make clear that "[n]otwithstanding" those enumerated remedies and "any contrary provision set forth herein (including without limitation the arbitration provisions set forth in § 28), Purchaser shall not be precluded from pursuing any remedies available under applicable law…."

[3] AAA's Commercial Arbitration Rule 43(a) states "[t]he arbitrator may grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties, including, but not limited to, specific performance of a contract."

Opposition at p. 5.   Plaintiffs, however, fail to cite any authority for the proposition that arbitration of a statutory claim is unconscionable or that such an arbitration agreement violates either statute, simply because there is no such authority.   An arbitration clause is not unconscionable.   *See Cole v. Burns Intern. Securities Serv.,* 105 F.3d at 1469 (holding that arbitration clause was not unconscionable); *Scaffidi v. Fiserv, Inc.*, 218 Fed. Appx. 519, 521 (7th Cir. 2007) (noting that the court repeatedly rejects the notion that arbitration clauses are unconscionable).   Further, it is neither illegal nor unconscionable for parties to contractually agree to arbitrate claims that have been created by statute. In *Cole v. Burns Intern. Securities Serv.*, the court reviewed whether an arbitration agreement was unconscionable in an employment discrimination context.   The court held, "[b]ecause the courts will always remain available to ensure that arbitrators properly interpret the dictates of public law, an agreement to arbitrate statutory claims of discrimination is not unconscionable or otherwise unenforceable." *See Cole v. Burns Intern. Securities Serv.,* 105 F.3d at 1469; *see also Booker v. Robert Half Int'l, Inc.*, 413 F.3d 77, 79 (D.D.C. 2005) ("[s]tatutory claims may be subject to agreements to arbitrate, so long as the agreement does not require the claimant to forgo substantive rights afforded under the statute.").   Although the claims in this case are brought under different statutes, the same result is appropriate here.

Additionally, neither the DCCPA nor the ILSA requires alleged violations of either law to be adjudicated in a court of law rather than by an arbitrator.   *See* D.C. Code § 28-3901 *et seq.* and 15 U.S.C. § 1701 *et seq.*   In fact, federal caselaw fully supports arbitration of federal statutory claims.   *See* Motion to Compel at p. 7; *see also Cole v. Burns Intern. Securities Serv.*, 105 F.3d at 1478 ("the Supreme Court now has made clear that, as a general rule, statutory claims are fully subject to binding arbitration.").   Indeed, to overcome enforcement of an

arbitration clause, Plaintiffs bear the burden of establishing "congressional intent to create an exception to the FAA's mandate with respect to the party's statutory claims."  *See Mintze v. American General Financial Serv., Inc.*, 434 F.3d 222, 229 (3rd Cir. 2006).  "Congressional intent can be discerned in one of three ways:  (1) the statute's text, (2) the statute's legislative history, or (3) 'an inherent conflict between arbitration and the statute's underlying purposes.'"  *See id.*  Here, Plaintiffs cannot, by reference to either the statutory language or legislative history, demonstrate that either statute at issue evinces intent to exempt claims brought under the statutes from arbitration.  Further, Plaintiffs have offered nothing to establish a conflict between the statutes and arbitration.  Considering Plaintiffs' failure to demonstrate any conflict between arbitration and the true essence of the statutes, the unambiguous language of the arbitration agreement, and the federal law's support for resolving disputes by way of arbitration, this issue must be resolved in Defendant's favor.  *See generally* Motion to Compel at pp. 4-5.

**WHEREFORE**, Defendant PNH Union Square L.L.C. respectfully requests this Court grant its Motion to Compel Arbitration and enter the attached order dismissing Plaintiffs' Complaint and award Defendant its costs as per the express terms of the Purchase Agreement

Dated:  December 14, 2007

Respectfully submitted,

By:_____/s/   Philip T. Evans_____
    Philip T. Evans (D.C. Bar No. 441735)
    Roxan A. Kerr (D.C. Bar No. 490310)
    HOLLAND & KNIGHT LLP
    2099 Pennsylvania Ave., N.W., Suite 100
    Washington, D.C.  20006
    Tel: (202) 955-3000/Fax: (202) 955-5564

    *Counsel for Defendant PNH Union Square L.L.C.*

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on the 14th of December, 2007, she caused a copy of the foregoing Motion and Memorandum to be served by means of the ECF system on:

Howard R. Shmucker
Law Offices of Howard R. Shmucker
1700 Pennsylvania Avenue, NW
Suite 400
Washington, DC  20006

Geoffrey T. Hervey
Bregman, Berbert, Schwartz & Gilday, LLC
7315 Wisconsin Avenue, Suite 800 West
Bethesda, Maryland 20814

/s/ Roxan A. Kerr
Roxan A. Kerr

# 5003372_v1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        :
**OMID ROKNI, et al.**                  :
                                        :
    **Plaintiffs,**  :
                                        :
    **v.**           :     **Case No. 1:07-cv-01474 -RJL**
                                        :
**PNH UNION SQUARE L.L.C.,**            :
                                        :
    **Defendant.**    :
                                        :
_____:

## <u>ORDER</u>

    The Court having considered Defendant's Motion To Compel Arbitration And Dismiss The Complaint, Or, In The Alternative, Stay Proceedings Pending Arbitration ("Motion to Compel"), Defendant's Memorandum of Points And Authorities In Support of the Motion to Compel, and good cause having been shown, it is this ____ day of _____, 2007;

    **ORDERED** that the Motion be and the same is hereby **GRANTED**.  It is further

    **ORDERED** that Defendant be awarded costs for obtaining dismissal of this action.

 

                                       _____
                                       Judge, U.S. District Court
                                       for the District of Columbia

cc:  Counsel of Record



# THE FLATS AT UNION ROW, A CONDOMINIUM
# CONDOMINIUM UNIT PURCHASE AGREEMENT

Title to be conveyed in the name(s) of:

Omid Rokni

Unit No: 313                                     Percentage Interest: .464%
Parking Space No[s].: G3-24                      Residential Expense
Storage Space No.: N/A                           Liability:          .502%

THIS CONDOMINIUM UNIT PURCHASE AGREEMENT (the "Agreement") is made between PNH UNION SQUARE L.L.C., a Delaware limited liability company ("Seller"), and Faye Rokni ("Purchaser") as of the 11th day of May, 20005 (the "Effective Date", such date being the date this Agreement is executed by the parties).

Seller desires to sell and Purchaser desires to purchase Condominium Unit No. 310 (the "Unit") and, if applicable, have assigned to such Unit the exclusive right to use and occupy Parking Space Number[s] G3-24 (the "Parking Space") as an Individual Limited Common Element (as defined in the Declaration) and, if applicable, Storage Space No. N/A (the "Storage Space") as an Individual Limited Common Element, in that certain condominium to be formed pursuant to the provisions of Section 42-1901.01, et seq., of the District of Columbia Code, 2001 edition, as amended (the "Condominium Act"), to be known as THE FLATS AT UNION ROW, A CONDOMINIUM (the "Condominium"), located at 2125 14th Street, N.W., Washington, D.C. 20009.

Seller and Purchaser, for good and valuable consideration, agree as follows:

1. PURCHASE AND SALE OF UNIT.

1.1 Seller agrees to sell to Purchaser, and Purchaser agrees to purchase, the Unit, together with the undivided interest in the Common Elements appertaining to the Unit as set forth in the Declaration of Condominium and, subject to the terms of this Agreement and if applicable, the assignment of the exclusive right to use and occupy the Parking Space and/or the Storage Space as an Individual Limited Common Elements to be made appurtenant to the Unit. The percentage interest of the Unit in the Common Elements of the Condominium (the "Percentage Interest"), as set forth in "Exhibit B" to the Condominium Declaration and as shown on "Exhibit 8" of the Public Offering Statement of the Condominium, is as set forth hereinabove. The Unit is part of a mixed use condominium consisting of a residential units and

1



commercial/retail units. Certain expenses of the Condominium will be payable only by the owners of commercial units, and other expenses ("Residential Expenses") will be payable only by the owners of residential units. Expenses of the Condominium payable by owners of commercial units and residential units are referred to herein as "Common Expenses." The percentage of liability of the Purchaser's Unit toward the payment of Common Expenses is the Percentage Interest of the Unit. The percentage of liability of the Purchaser's Unit for the payment of Residential Expenses as set forth in "Exhibit B" of the Bylaws, and as shown on "Exhibit 8" of the Public Offering Statement, is identified on Page No. 1 hereinabove. The Seller shall warrant the Unit against structural defects in accordance with the requirements of the Condominium Act (including without limitation Section 1903.16 thereof). The warranty rights of the Purchaser and the warranty obligations of the Seller are set forth on the Limited Condominium Warranty attached hereto as Exhibit "F". Any furnishings and personal property displayed in any model unit or in any PN Hoffman, Inc. Sales and Design Center (the "Sales and Design Center") are not part of the Unit and are not included in the purchase price of the Unit. All illustrations, models, architectural renderings and unit features shown on any promotional or other materials provided to Purchaser, or exhibited in the Sales and Design Center, are for display or illustrative purposes only, and may not be representative of Unit or the Condominium building features. Additionally, any features of the Unit or Condominium building shown on any floor plans, marketing materials, plats, plans, or any other promotional materials are subject to change by Seller in its discretion due to such factors as, but not limited to, building constraints, inspections and permitting approvals. Estimated dimensions or square footages shown in any floor plan sketches or provided in other related sales materials are approximations only.

1.2    Purchaser acknowledges that the Unit, Parking Space, and Storage Space are *not* being sold or assigned to Purchaser on a "per square foot" basis. The Purchaser acknowledges that the Parking Space and Storage Space will be delivered unimproved, except as otherwise provided herein. Notwithstanding the assignment of the numbered Parking Space and/or Storage Space to Purchaser identified in Paragraph 1.1 above (if applicable), Seller shall have the right, in Seller's sole discretion, to substitute a different numbered Parking Space and/or Storage Space within the Condominium (i) in the event an error is made by Seller in the allocation of said Parking Space and/or Storage Space to Purchaser or (ii) in the event Seller is required to relocate said Parking Space and/or Storage Space in order to comply with applicable law (including without limitation the Americans With Disabilities Act); provided, however, that such substituted Parking Space and/or Storage Space shall be of comparable value to the Parking Space and/or Storage Space specified in Paragraph 1.1 above, as determined by Seller in its reasonable discretion. Purchaser hereby agrees that the substitution by Seller of a different Parking Space and/or Storage Space within the Condominium shall not entitle Purchaser to terminate this Agreement nor give rise to any claims for damages against Seller. Purchaser acknowledges and agrees that, in the event the Parking Space and/or Storage Space to be assigned to Purchaser pursuant to the terms hereof is/are not available for immediate assignment

2





to Purchaser at the time of Settlement due to ongoing construction activity at the Condominium, then Seller shall have the right in its sole discretion to temporarily designate an alternative parking space[s] and/or storage space[s] within the Condominium for use by the Purchaser until the Parking Space and/or Storage Space to be permanently assigned to Purchaser become available; provided that such temporary assignment period shall in no event exceed 365 calendar days). In no event shall Seller's designation of a temporary, substitute parking space or storage space entitle Purchaser to terminate this Agreement, give rise to any claims for damages against Seller or entitle Purchaser to delay or postpone the date of Settlement. The provisions of this Paragraph shall expressly survive the Settlement hereunder.

All references herein to the "Unit" shall be deemed to include the Residential Unit (as defined in the Declaration), (unless otherwise noted herein or the context indicates otherwise), and, as applicable, all Limited Common Elements (including without limitation the Parking Space and Storage Space, as applicable) assigned or to be assigned to the Residential Unit as provided herein.

    2. PURCHASE PRICE AND TERMS OF PAYMENT.

        2.1 The purchase price of the Unit is Four Hundred Fourteen Thousand Nine Hundred Dollars ($414,900.00). The purchase price of the assignment of the Parking Space is Forty-Two Thousand Dollars ($42,000.00). The purchase price of the assignment of Storage Space is not applicable. The total purchase price for the Unit and, if applicable, the assignment of Parking Space and/or Storage Space (such total purchase price, exclusive of settlement costs, condominium fees, and prorated amounts of prepaid items, is collectively referred to as the "Total Purchase Price") shall be paid as follows:

    (1) Deposit upon signing this Agreement, to be applied as partial
    payment of the Total Purchase Price, receipt of which amount
    is hereby acknowledged                         $31,983.00

    (2) (a.) __X__ Proceeds of conventional loan. (b.) ____ All cash.    TBD

    (3) Balance Due at time of Settlement, in cash or by
    certified or cashier's check.                         TBD

    **Total Purchase Price**....................................................... **$456,900.00**

The Total Purchase Price may be subject to adjustments, including but not limited to, fees for additional Options (as defined hereinbelow), as more fully set forth in Paragraph 4 of this



Agreement, which adjustments shall be reflected in a Change Order Addendum, which is attached as Exhibit "C" hereto.

2.2  Seller shall place Purchaser's deposit in escrow in an interest-bearing account in a bank or savings and loan association in an escrow account in accordance with the requirements of Section 42-1904.09 of the Condominium Act. The deposit together with any interest earned thereon (the "Deposit") shall be credited to Purchaser at Settlement (as defined in Paragraph 7) and the Total Purchase Price shall be paid to Seller by certified or cashier's check or other immediately available funds at Settlement. The term "Deposit" includes any interest earned on any deposit made by the Purchaser under this Agreement. The Deposit shall not be deemed to include any amounts paid for Options.

2.3  The Deposit shall be disbursed upon the following terms:  (a) if Settlement is made, the Deposit will be delivered to Seller at the time of Settlement, or (b) if Settlement is not made as provided herein because of Purchaser's default or failure to comply with any term of this Agreement, Purchaser shall forfeit the Deposit and any other amounts paid under this Agreement, including any amounts paid for Options, which may be retained by Seller in its sole discretion as liquidated damages.

3. FINANCING

Purchaser hereby elects the following method of financing, pursuant to the terms of this Agreement:

(Check One)

_____  No financing arrangement (all cash)
_____  Financing arranged through lender of Purchaser's choice
__X___  Financing arranged through a lender designated by Seller (a "Designated Lender")

Regardless of whether Purchaser elects to pursue financing through a lender of Purchaser's choice, a Designated Lender, or pay all cash at Settlement, Purchaser must submit a written mortgage loan pre-approval letter from one of the Designated Lenders prior to ratification of this Agreement.

3.1  <u>No Financing Arrangement (all cash)</u>.  If Purchaser elects to pay the Purchase Price all in cash, then this Agreement shall be in no way contingent upon Purchaser obtaining any financing and Purchaser assumes full responsibility to initiate and pursue all steps necessary to obtain the funds required for Settlement. Further, within seven (7) days from the Effective Date, Purchaser shall provide Seller with commercially reasonable proof of Purchaser's

4

financial ability to pay the balance due at Settlement. If Purchaser fails to provide such commercially reasonable proof, then Seller may terminate this Agreement by providing notice to Purchaser within thirty (30) days from the Effective Date, in which case the Deposit shall be returned to Purchaser. If Purchaser fails to pay the Purchase Price due at Settlement, then this Agreement, at the sole option of Seller, may be terminated and the Deposit retained by Seller. **Purchaser acknowledges that, in the event Purchaser has elected to purchase the Unit with no financing arrangement (all cash), then the purchase of the Unit and the assignment of a Parking Space and/or a Storage Space is in no way contingent on Purchaser's ability to obtain financing for its proposed purchase of the Unit and the assignment of the Parking Space and/or the Storage Space, whether from a lender of Purchaser's choice, or a Designated Lender.**

   3.2 <u>Financing Arranged through Lender of Purchaser's Choice or Designated Lender(s).</u> If Purchaser elects to obtain financing through a lender of Purchaser's choice or through a Designated Lender, then this Agreement shall be contingent upon financing for a period of fifteen (15) days from the Effective Date (the "Financing Contingency Period"). Within seven (7) days from the Effective Date, Purchaser shall provide Seller with (i) a letter from one of the Designated Lenders stating that the Purchaser is approved for a mortgage in the amount required to purchase the Unit and the assignment of a Parking Space and/or Storage Space, as applicable (less the amount of the Deposit and any amounts that will be paid in cash by Purchaser at Settlement), subject only to commercially reasonable conditions and in accordance with the Designated Lender loan criteria described hereinbelow, and (ii) commercially reasonable proof of Purchaser's financial ability to pay the balance due at Settlement. If during the Financing Contingency Period, Purchaser cannot obtain financing approval, then, provided Purchaser has not breached his or her obligation to apply for financing, then Purchaser at its sole option may terminate this Agreement and the Deposit shall be returned to Purchaser. Purchaser shall be deemed to have breached his or her obligation to apply for financing under this Agreement upon the occurrence of any of the following: (I) Purchaser fails to timely file a complete application for financing so that the letter from a lender required pursuant to Section 3.2(i) above can be provided to Seller within ten (10) days after the Effective Date; (II) Purchaser materially misrepresents his or her financial situation or intentions at the time Purchaser executes this Agreement; (III) Purchaser represents his or her financial situation or intentions to the lender as materially different from the situation and intentions represented to Seller at the time this Agreement is executed by Purchaser (unless Purchaser's financial situation has in fact changed); (IV) Purchaser voluntarily or involuntarily changes his or her financial situation so that such change causes the Purchaser not to obtain financing; and (V) Purchaser fails to promptly, diligently, and in good faith furnish the lender with all information necessary to consider Purchaser's application for financing and sign all documents signed by the lender, within the specified time limits. If Purchaser fails to obtain necessary financing as a result of the occurrence of any of (I)-(V) of this sub-paragraph (b), or otherwise fails to timely file all applications and comply with all other lender requirements within

5



the specified time frames, or timely if there are no specified time frames, then at the option of Seller, said option to be exercised, if at all, within thirty (30) days after the Effective Date, the Purchaser shall forfeit the Deposit and all interest accrued thereon as liquidated damages. Upon expiration of the Financing Contingency Period, this Agreement shall not be contingent on financing and if Purchaser fails to pay the Purchase Price due at Settlement, then this Agreement, at the sole option of Seller, may be terminated, and Seller shall have all the rights and remedies available to Seller upon a default of Purchaser as set forth in Section 12 hereinbelow.

      If a Designated Lender finances the purchase of the Unit and the assignment of the Parking Space and/or Storage Space, as applicable, Purchaser shall be entitled to a credit in the amount of $10,000.00 towards closing costs at Settlement and Purchaser will pay all other lender fees, including without limitation the loan origination fee, loan discount fee, appraiser, inspection and credit report fees. Purchaser hereby expressly acknowledges and agrees that such credit may be paid at Settlement either by the Designated Lender or Seller. If Purchaser elects to obtain financing from a lender of Purchaser's choice, then Purchaser shall pay all lender's fees including without limitation the loan origination fee, loan discount fee, appraiser, inspection and credit report fees, Purchaser shall not receive a credit in the amount of $10,000.00 at Settlement toward closing costs, and Seller shall not be obligated to pay any fees charged by a lender.

      Purchaser's credit will be subject to approval by the Designated Lender making such mortgage loan to Purchaser, although Purchaser may ultimately use any Lender of his or her choice. Designated Lenders shall approve Purchaser based on the following loan criteria: 10/1 ARM at annual interest rate of 7 ½ %, requiring monthly payments principal and interest, and with a Deposit equal to ten percent (10%) of the total purchase price.

PURCHASER HEREBY ACKNOWLEDGES THAT THIS AGREEMENT SHALL IN NO WAY BE CONTINGENT UPON FINANCING IF PURCHASER ELECTS NOT TO OBTAIN FINANCING AS PROVIDED IN SECTION 3.1 ABOVE, AND, IF PURCHASER ELECTS TO OBTAIN FINANCING THROUGH A DESIGNATED LENDER OR THROUGH A LENDER OF PURCHASER'S CHOICE, THEN THIS AGREEMENT WILL BE CONTINGENT ONLY FOR A PERIOD OF FIFTEEN (15) DAYS, SUBJECT TO THE TERMS AND CONDITIONS SET FORTH IN SECTION 3.2 ABOVE. PURCHASER HEREBY ACKNOWLEDGES THAT IN ALL EVENTS THIS AGREEMENT IS NOT CONTINGENT UPON THE SALE OR RENTAL OF PURCHASER'S PRESENT HOME, IF ANY, OR ANY OTHER PROPERTY, AND THAT ANY CONTINGENCY A LENDER MAY SET FORTH IN A PRE-APPROVAL LETTER IS A CONTINGENCY SOLELY PLACED ON PURCHASER.



Purchaser promptly shall advise Seller in writing of any material change in Purchaser's financial condition.

4. UNIT OPTIONS.

4.1    In the event that Seller offers certain options or upgrades for the Unit, Purchaser may select from a list of such options and upgrades offered by Seller (collectively the "Options"). The cost of any Options will be set forth in the materials to be provided separately to Purchaser, to the extent the cost thereof are not otherwise set forth in the exhibits to this Agreement.

4.2    If Purchaser elects to purchase any Options from Seller, Purchaser shall pay Seller the amount of  one half (1/2) of the total cost of the Options (the "First Options Payment") simultaneously with execution of a Change Order Addendum (in the form attached hereto as Exhibit "C").  Purchaser hereby acknowledges and agrees that the First Options Payment shall not constitute a portion of the Deposit, and that Seller shall have the right to deposit the First Options Payment directly into the Seller's operating account and to expend the First Options Payment in order to carry out the implementation and installation of the Options. The balance due for the Options (the "Final Options Payment") shall be paid over to Seller at Settlement. Purchaser acknowledges that the First Options Payment shall be non-refundable to Purchaser. Accordingly, if Settlement does not occur for any reason other than Seller's default, including, but not limited to, Purchaser's inability to obtain financing or lack of funds to close, Seller shall have the right to retain the entire First Options Payment made to Seller under this Agreement, in addition to any other remedies that Seller may have.

5. CONDOMINIUM ASSESSMENTS.

5.1  Purchaser is obligated and agrees to pay monthly his or her Unit's Percentage Interest of the Common Expenses of the Condominium, as set forth in "Exhibit B" the Declaration and Exhibit 8 of the Public Offering Statement and his or her percentage of liability for the payment of Residential Expenses of the Condominium, as set forth in "Exhibit B" of the Bylaws and Exhibit 8 of the Public Offering Statement. Seller's estimate as of the Effective Date of the aggregate monthly Condominium fee payable for the Unit for Common Expenses and Residential Expenses is set forth in Exhibit 8 of the Public Offering Statement. Additionally, the owner of each unit to which a parking space is assigned as an Individual Limited Common Element will be charged initially a monthly fee of $25.00  for each such parking space, and the owner of each unit to which a storage space is assigned will be charged initially a monthly fee of $10.00  for each such storage space, such fees being potentially subject to the same annual increases as the condominium assessments and fees for the Units.  Purchaser acknowledges and



agrees that the projected fees payable by Purchaser described in Exhibit 8 of the Public Offering Statement are only estimates and are not guaranteed by Seller.

6. CONVEYANCE OF TITLE.

6.1  At Settlement, Seller shall convey to Purchaser good and merchantable title to the Unit (together with the Unit's respective undivided Percentage Interest in the Common Elements) by special warranty deed, subject only to the general real estate taxes and water and sewer assessments for the current tax year not then due; the Repurchase Right, as more particularly described in Paragraph 31 hereinbelow; the Condominium Act, the Declaration, Bylaws, Plat and Plans and Rules and Regulations of the Condominium; easements, covenants and conditions of record; ordinances and regulations of competent municipal or other governmental authorities; easements for sewers, water, gas, fuel line, drainage, electric, telephone and other similar utilities, if any, granted or to be granted; the Repurchase Right; and Purchaser's deed of trust, if any. Purchaser shall, upon request, execute any instruments creating or consenting to such covenants, conditions, easements, or restrictions. At the time of Settlement, Seller will also cause the Parking Space and Storage Space, if applicable, to be assigned to the Unit as an Individual Limited Common Elements appurtenant thereto.

6.2  In the event that, upon examination, the title should be found defective and the defects are of such character that they may be remedied within a reasonable time by legal action to perfect the title, such action must be taken promptly by and at Seller's reasonable expense, whereupon the time herein specified for full Settlement by the Purchaser will thereby be extended for the period necessary for such action, not to exceed six (6) months. If Seller is unable to perfect title as specified herein, then Seller may terminate this Agreement and cause the Deposit and any advance for Options to be returned to Purchaser. In such case, Seller is expressly released from all other liability for damages arising from such event, and in no event shall Seller be liable for any damages for defects in title. If Seller chooses to terminate this Agreement and return the Deposit and advance payments for Options to Purchaser pursuant to this Paragraph, then all rights and liabilities of the parties under this Agreement shall forthwith terminate.

7. SETTLEMENT.

7.1  Settlement on the purchase and sale of the Unit (the "Settlement") shall occur on a date specified by a written notice (the "Settlement Notice") from Seller to Purchaser, (to be delivered to Purchaser only after the expiration of Purchaser's rights of rescission pursuant to the Condominium Act) stating that the Unit will be ready for conveyance by Seller (subject to completion of punch list items as set forth below in Paragraph 9.1) on the date specified in the

8



Settlement Notice (the "Settlement Date"), which date will be not fewer than ten (10) days from the date of the Settlement Notice. Purchaser shall complete Settlement on the Settlement Date.

7.2    If Settlement does not occur on the Settlement Date for any reason other than Seller's default, including, but not limited to, Purchaser's inability to obtain financing or lack of funds to close, then Purchaser shall be in default under this Agreement and Seller shall have the right in its discretion to declare Purchaser to be in default. Upon such an occurrence, Seller may in its sole discretion terminate this Agreement and the Deposit provided herein, plus any amounts paid on account for Options, may be retained by Seller as fixed liquidated damages. Notwithstanding the foregoing, in the event Settlement is delayed due to Purchaser or Purchaser's lender, then, if requested in writing by the Purchaser, Seller may in its sole discretion agree to extend the date of Settlement for up to fifteen (15) days. Purchaser hereby agrees that Seller shall be entitled to payment by Purchaser at Settlement of an amount equal to $165.00 for each day that Settlement is delayed beyond the date specified in the Settlement Notice up to a maximum of fifteen (15) days. If Settlement is delayed more than fifteen (15) days beyond the Settlement Date specified in the Settlement Notice, then Seller may, in its sole discretion, (i) terminate this Agreement and in such event, the Deposit herein provided, plus any amounts paid on account for Options, may be retained by Seller as fixed liquidated damages; or (ii) agree to postpone Settlement further, in which case Purchaser shall agree to pay at Seller at Settlement an amount equal to $250.00 for the sixteenth (16th) day and each additional day that Settlement is delayed beyond the date specified in the Settlement Notice.

7.3    At Settlement, Purchaser shall pay the Total Purchase Price for the Unit and, upon receipt thereof, Seller shall deliver the deed for the Unit. Purchaser shall be entitled to occupy and have possession of the Unit from and after Settlement. Purchaser shall  pay at Settlement all settlement costs not previously paid, including, without limitation, credit report fee, lender's appraisal fee, District of Columbia Real Property Recordation Tax (1.1% as of the Effective Date), document recordation charges, fees for title examination, preparation of all documents of conveyancing and all mortgage instruments, settlement fees, notary fees, and fees for mortgagee's title insurance, private mortgage insurance premiums, if any, any loan origination, discount or similar fees, and fees for owners title insurance (if obtained) and other charges in the nature of prepaid expenses, escrows for taxes and the like. Purchaser shall also pay all Condominium assessments and initial capital contribution, as set forth in Paragraphs 5 and 7.4 respectively, due at Settlement. Seller will pay the D.C. Transfer Tax (1.1% as of the Effective Date) and, if one of the mortgage lenders (including the applicable loan officer(s) listed below) identified below are selected for Settlement, Purchaser shall be entitled to a credit described in Paragraph 3.2 hereinabove toward closing costs which otherwise would be chargeable to the Purchaser.

9



Seller's Designated Lenders:
First Savings Mortgage Corporation
10401 Connecticut Avenue, Suite 103
Kensington, Maryland 20895
Contact:  Renee Schuster Voyta, Vice President

Wells Fargo
12701 Fair Lakes Circle, Suite 275
Fairfax, VA 22033
Contact:  W. Scott Hawkins, Home Mortgage Consultant

In the event that Purchaser decides to select a lender or a loan officer for Designated Lender other than as indicated above, Purchaser shall not be entitled to the credit in the amount of $10,000.00 toward closing costs as provided hereinabove.  Purchaser shall notify Seller in writing not less than sixty (60) days prior to the projected date of Settlement of its selection of settlement company or settlement attorney.  If no such notice is given to Seller within the aforementioned time period, then Seller may designate the title attorney or title company to conduct Settlement.

7.4  Purchaser shall pay at Settlement as an initial capital contribution to the Condominium, an amount equal to two times (2x) the "Projected Total Monthly Assessment" for Common Expenses and Residential Expenses payable for the Unit as set forth in "Exhibit 8" of the Public Offering Statement of The Flats at Union Row, A Condominium ("Initial Working Capital").  The Initial Working Capital payment will be allocated to the Condominium's working capital funds.  The Initial Working Capital is in addition to, and not in lieu of, the regular monthly assessments payable in respect of the Unit, which will be prorated at Settlement, and this amount is nonrefundable.

7.5  Purchaser hereby acknowledges that any information given to Purchaser by Seller, or any sales representative, employee, or agent of Seller with respect to anticipated dates for the delivery of title and possession of the Unit is not to be considered a material part of this Agreement or a material representation or warranty by Seller.

10



7.6 (a) Seller agrees and obligates itself to complete construction of the Property no later than thirty-six months following the date this Agreement is executed by the Purchaser. If Settlement shall not have occurred within thirty-six months after the execution of this Agreement by Purchaser, due to reasons within Seller's control, Purchaser shall have the option of either:

      (i)    terminating this Agreement by written notice to Seller, delivered at any time prior to Seller's establishment of a settlement date as provided in Paragraph 7.1 of this Agreement, in which event Seller shall, if Purchaser shall not then be in default, cause the Deposit and all other payments made by Purchaser to Seller hereunder, if any, to be returned to Purchaser, and neither party shall have any further liability or obligation hereunder; or

      (ii)   electing to proceed with the purchase of the Unit when the Unit is completed.

Notwithstanding the foregoing and any contrary provision set forth herein (including without limitation the arbitration provisions set forth in Section 28), Purchaser shall not be precluded from pursuing any remedies available under applicable law for Seller's wrongful breach or cancellation of this Agreement, including any rights to specific performance as required or authorized by the Interstate Land Sales Full Disclosure Act.

      (b)    Settlement on the purchase of the Unit shall occur when Seller is legally permitted to convey the Unit, within thirty-six (36) months after execution of this Agreement by Purchaser; provided, however, that if Seller is delayed in the performance of the aforesaid obligation for reasons beyond the control of Seller, then the time for performance of Seller's obligation shall be extended for a reasonable period of time, and such delay shall not be considered a breach of this Agreement, provided that in no event shall Settlement be extended to a date more than forty-eight (48) months after execution of this Agreement by Purchaser. Reasons beyond the control of Seller for the impossibility of performance shall include, without limitation, acts of God, fire, earthquake, terrorism, flood, explosion, condemnation, or acts of governmental agencies asserting jurisdiction over the Condominium or the Property, and any other legally supportable justification under the laws of the District of Columbia, which would excuse Seller from completing the Unit within such thirty-six (36) month period. Notwithstanding anything to the contrary in this Agreement, if Settlement does not occur due to reasons set forth in this Paragraph, then, in the event Purchaser elects to terminate this Agreement, Seller's sole obligation to Purchaser shall be to cause the Deposit and fees paid for Options to be returned to Purchaser.



8. SETTLEMENT ADJUSTMENTS.

   8.1    All monthly condominium assessments (including without limitation Common Expenses and Residential Expenses) for the month in which Settlement is made, if any, real property taxes, insurance premiums, any assessments of water, sewer, or similar services to the Condominium, and any other prepaid or pro-ratable items shall be prorated between Purchaser and Seller as of the date upon which Seller is prepared to close according to the terms of this Agreement. Thereafter, each of these items shall be assumed and paid by Purchaser. In the event that at time of Settlement any such item has not been allocated among the units the total of such items for the Condominium shall be allocated among the units (on an estimated basis, if necessary) in accordance with each unit's Percentage Interest as set forth in the Declaration.

9. INSPECTIONS.

   9.1 Pre-Settlement Inspection.  Seller shall notify Purchaser not less than ten (10) days prior to Settlement of the date and time that the Unit will be ready for inspection. Upon receipt of such notice, Purchaser shall promptly arrange for an appointment with a representative of Seller to make the pre-settlement inspection. At such inspection, the Pre-Settlement Inspection Form (the "Report") set forth as an exhibit hereto shall be completed and executed by Purchaser and by a representative of Seller. Purchaser shall attend such inspection and participate in the completion of the Report prior to Settlement. Seller shall complete, install or repair (as the case may be) any such "punch list" items noted on the Report within a reasonable time, but in no event shall the existence of any such items be a bar to Settlement or a ground to postpone Settlement beyond the time otherwise appointed in accordance with the terms of this Agreement, unless the Unit is rendered uninhabitable as a result of the deficiency(ies) noted in the Report, as determined by Seller in its reasonable discretion. At Settlement, no escrows for such items shall be established for any reason or under any circumstance whatsoever. Failure of Purchaser to arrange for a Pre-Settlement inspection within the aforementioned ten (10) day period or failure of Purchaser to keep the inspection appointment shall constitute full acceptance of the Unit by Purchaser.   Upon acceptance of the deed by the Purchaser,  Purchaser agrees to hold Seller free from liability for any visible defects not specifically noted in the Report; provided the terms detailed in the "Limited Condominium Warranty" will govern the limit of Seller's responsibility with respect to items covered by such warranty. After Settlement, Purchaser shall allow Seller adequate access to the Unit to remedy items noted on the Report during normal working hours and as mutually agreeable. The Report shall constitute Seller's warranty to Purchaser that any incomplete work will be performed as promptly as materials, weather and workload permit.

12

9.2    Move-in / Move-out Policy.    The Purchaser shall abide by the move-in / move-out policy for the Condominium as referenced in the Bylaws and/or the Rules and Regulations, and in accordance with the move-in schedule established by Seller. The Purchaser shall be responsible for any damage to the common areas of the Condominium building (including the elevators and hallways) and to the Unit resulting from the initial move-in after Settlement (whether by Purchaser, its invitees or tenants).    A move-in fee of $150.00 shall be payable for all move-ins, including the initial move-ins by the first occupants of the Unit (which amount shall be collected at Settlement from Purchaser).

10. WARRANTY.

10.1 At Settlement, Seller shall deliver to Purchaser an executed warranty in the form set forth in the "Limited Condominium Warranty" attached hereto as Exhibit "F". Seller reserves the right at its option and at any time (either before or after the sale of a unit) to grant additional warranties with respect to any unit or the common elements.

11. RISKS.

11.1 The risk of loss or damage to the Unit by fire or other casualty is assumed by Seller until Settlement.    If such loss or damage occurs, Seller may terminate this Agreement and refund the Deposit and any advance paid for Options to Purchaser hereunder without further liability or obligation to Purchaser.    Purchaser shall have no right or claim to fire or other casualty insurance proceeds.

12. DEFAULT, SUBORDINATION, MERGER AND ASSIGNMENT.

12.1 Except as otherwise specifically provided herein, if Purchaser shall default in any of the payments or the timely performance of obligations called for in this Agreement, and fails to cure such default within the ten (10) days after written notice from Seller, then at the option of Seller, Purchaser shall forfeit any and all rights under this Agreement, and any amount theretofore paid under the terms of this Agreement may be retained by Seller as liquidated damages. It is acknowledged and agreed by Seller and Purchaser that the aforesaid liquidated damages are not a penalty, but represent the best and most reasonable estimate of the parties hereto of the actual damages which Seller shall sustain upon any default by Purchaser, which damages are not capable of precise determination. If due to defects in title Seller shall be unable to deliver title in accordance with the provisions of this Agreement, Seller's liability shall be limited to the return of any payments made by Purchaser hereunder.

12.2 Purchaser's interest in this Agreement shall be subordinate to any lien placed by Seller against the Unit or the Condominium at any time prior to Settlement. Purchaser agrees

13





to execute such further assurances of this covenant as may be required from time to time by Seller. Seller shall cause any such lien against the Unit to be released at or prior to Settlement, to the extent required by Paragraph 6 of this Agreement.

12.3 This Agreement shall be binding upon the parties hereto, and, as applicable, each of their respective heirs, personal representatives and successors.

12.4 This Agreement is personal to Purchaser and is not assignable by Purchaser either voluntarily, by operation of law, or otherwise. Seller may assign its rights hereunder in Seller's sole discretion.

13.    URBAN CONDITIONS.

13.1    Purchaser is purchasing the Unit subject to, and accepts all the risks associated with, conditions related to urban environments including, but not limited, to noise created by adjacent neighbors/property owners, bars, restaurants, nightclubs, construction, general street traffic, emergency vehicles, aircraft, general airport noise, noise and vibrations common in multi-dwelling buildings (from equipment such as, including but not limited to, exhaust fans and air condenser units) and other noise common in urban settings; common urban pests; vibrations from large vehicles such as waste removal vehicles, buses, metrorail trains and street cleaning equipment; odors including trash and other odors emanating from adjacent properties or other units in a multi-dwelling building, and, future development of surrounding property that may impact including, but not limited to, the light and air of the Unit and views from the Unit.

14.    SPECIFICATIONS.

14.1    Specifications for the Unit are listed and included with this Agreement as Exhibit "A" hereto (the "Specifications"). These Specifications include the appliances, finishes, and the general characteristics of the Unit.    Seller reserves the right to substitute manufactured items or products in the Unit should sources become unavailable.

14.2  A conceptual sketch of the Unit is shown on Exhibit "B" attached hereto. This sketch generally delineates the rooms and layout of the Unit. The sketch is conceptual in nature and is not intended to be scaled for room dimensions. Final build-out of walls, ceilings, kitchen, baths, bedrooms, and specific features and details of the Unit may vary from the conceptual sketch due to construction constraints beyond the Seller's control or actual knowledge and Purchaser shall hold Seller harmless for such constraints on the final build-out of the Unit.

14



14.3  Furniture, wall coverings, window treatments, furnishings or the like as shown in or about any model unit, sales materials, renderings, or the Sales and Design Center are for display purposes only and are not considered a part of the Unit for the purposes of this Agreement. Further, the location of wall switches, thermostats, chases, exposed ductwork, exposed sprinkler lines and heads, vents, exposed plumbing lines, plumbing, electrical outlets, fireplaces (if applicable), and similar items may vary from unit to unit and may not be as shown in any model unit and any marketing materials. Any floor plans, sketches or sales drawings shown to Purchaser are for general illustrative purposes only and may not be in accordance with the final build-out of the Unit. The Unit is being sold unfurnished and will contain only the appliances and equipment installed at the time of inspection of the Unit by Purchaser, unless otherwise noted (including the appliances and equipment set forth in the Specifications). Seller will finish and equip the Unit only in accordance with the Specifications and Options selected by Purchaser for the Unit. Any scale model of the Unit or Condominium is only an artist's conception and is subject to change.

14.4  The Unit also will have unfinished concrete ceilings which may be characterized by markings such as, but not limited to, patches, plywood form imprints, small holes, cracks, written markings and stains. These characteristics of the concrete ceilings are not considered structural defects and will be conveyed to the Unit Owner "AS IS". Due to continuing changes in products, building codes and availability of materials, the Seller reserves the right to incorporate new design features or equivalent materials at any time without notice. Additionally, variations (such as color) occurring in Units or Common Areas of building materials and finishes, such as tile, granite, carpeting in Common Areas are not considered defects and will not be replaced by the Seller if variation occurs. This provision shall survive Settlement..

15. DISTRICT OF COLUMBIA SOIL DISCLOSURE REQUIREMENT.

15.1  Purchaser confirms that Seller has advised it, pursuant to Title 45, Section 308 of the District of Columbia Code, that the soil on the subject property on which the Condominium is located is noted in the Soil Survey of the District of Columbia as Urban Land underlain by sedimentary deposits. Purchaser has been advised that it may obtain further information in this regard by engaging a soil testing laboratory, the D.C. Department of Environmental Services, or the Soil Conservation Service of the U.S. Department of Agriculture. Nothing herein shall constitute a representation or warranty by Seller as to the soil characteristics of the subject property on which the Condominium is located.

15



16. UNDERGROUND STORAGE TANKS.

16.1  In accordance with the requirements of the D.C. Underground Storage Tank Management Act of 1990 as amended by the District of Columbia Underground Storage Tank Management Act of 1990 Amendment Act of 1992 (D.C. Code 6-995.1 et seq.) (the "Act") and the D.C. Underground Storage Tank Regulations, 20 DCMR Chapters 55-68 (the "Regulations"), Seller hereby informs Purchaser that Seller has no knowledge of the existence of an "underground storage tank" (as that term is defined in the Act and the Regulations) during the period of Seller's ownership. Seller shall provide an Underground Storage Tank Real Estate Transfer Disclosure Form at Settlement.

17. NOTICES.

17.1  All notices and demands required or given pursuant to the terms of this Agreement shall be in writing and served by certified   mail or personal delivery (including overnight courier) at the address of the Purchaser indicated below, or if to Seller:  PN Hoffman, Inc., 4725 Wisconsin Avenue, NW, Suite 200, Washington, DC 20016.

18. DESIGNATIONS AND CAPTIONS.

18.1  In any designation hereunder, reference to the masculine gender shall be deemed to included the feminine gender wherever same may be appropriate, and the plural shall be substituted for the singular or the singular substituted for the plural in any place herein in which the context may require substitution.

18.2  The captions contained in this Agreement are for convenience only and are not to be considered a material part hereof, and are not intended in any way to limit or enlarge the terms or provisions of this Agreement.

19. INITIAL OPERATING PERIOD.

19.1 During the "Declarant Control Period", at Seller's election (i) the Seller (as Declarant of the Condominium)  shall pay the costs of operating the Condominium and (ii) each Unit Owner, in lieu of an assessment against the units for Common Expenses and Residential Expenses, shall pay to Seller a fee in an amount equal to 90% of the units' estimated projected total monthly assessment for Residential Expenses and Common Expenses (or portion of a month on a pro rata basis) during the Declarant Control Period that the unit owner owns a unit. The Seller shall not be obligated to fund or otherwise contribute to any capital or other reserve fund for the Condominium during the Declarant Control Period.  "Declarant Control Period," as defined in the Bylaws, means the period of time commencing on the date that the Condominium

16



is created and ending on the date which is ninety (90) days after units to which 75% of the
Percentage Interests appertain have been conveyed by Seller or, if later, two (2) years from the
conveyance of the first unit, or on such earlier date as the Seller, in its sole discretion, may
determine.

20.  AGREEMENT EXPRESSES ENTIRE UNDERSTANDING.

20.1  This Agreement together with the "Financial Information Sheet" completed
by Purchaser and delivered to Seller constitute the entire agreement between the parties.  No
representations, warranties, undertakings, promises, claims, advertising or promotional activities,
made or conducted by Seller, or Seller's agents or sales representatives, whether oral, implied or
otherwise, shall be binding upon Seller unless the same are expressly set forth in this Agreement
or in a subsequent amendment, supplement or rider hereto executed by Seller.  All amendments,
supplements or riders hereto, if any, shall be in writing and executed by both parties.

20.2  No representations or agreements with respect to modifications or changes
in the Unit or Options required or requested by Purchaser, will be recognized unless such
representations or agreements are in writing, signed by the parties hereto, and any required
payments for such modifications, changes or Options are made at the time of the execution of
such writing.

20.3  Unless oral statements or promises are reduced to writing and included in
this Agreement, such statements or promises may not be enforceable under law.  By including
the terms below, Purchaser and Seller are making them a part of this Agreement.  THIS
PARAGRAPH SHOULD NOT BE LEFT BLANK IF YOU ARE RELYING ON ANY ORAL
STATEMENTS OR PROMISES.

The following oral statements or promises have been made by Seller, Seller's agent, sales
representatives, or Purchaser.  Performance of each of these statements or promises is
incorporated into each party's obligation to fully perform the terms of this Agreement:



NONE

21.  COUNTERPARTS.

21.1  This Agreement may be executed in multiple counterparts, each of which,
when so executed and taken together, may be considered an original.

17



22. TIME OF ESSENCE.

      22.1 Time shall be considered of the essence in this Agreement.

23. RECEIPT OF PUBLIC OFFERING STATEMENT.

      23.1 Purchaser hereby acknowledges that s/he has received a copy of the Public Offering Statement, and exhibits thereto (including without limitation the Declaration of Condominium and Bylaws), for The Flats at Union Row, A Condominium (the "Public Offering Statement"). Purchaser hereby ratifies and agrees to be bound by the provisions of the foregoing documents, as each such document may be duly amended from time to time.

24.    ACCESS TO UNIT PRIOR TO SETTLEMENT.

      24.1 In order to comply with insurance requirements and to assure the safety of Purchaser and Seller's personnel, Purchaser shall not have access or entry to the Unit, the Condominium building or the property on which the Condominium building is being constructed (the "Construction Site") during construction, nor may Purchaser store any of its possessions in or about the Unit or the Construction Site prior to Settlement of the Unit and delivery of possession to Purchaser hereunder. **PURCHASER ACKNOWLEDGES AND AGREES THAT ENTRY INTO THE UNIT OR THE CONSTRUCTION SITE WITH OR WITHOUT SELLER'S PERMISSION OR ACCOMPANIED OR UNACCOMPANIED BY SELLER'S SALES REPRESENTATIVES OR PERSONNEL, SHALL BE AT PURCHASER'S, ITS AGENTS', GUESTS', CONTRACTORS', INSPECTORS' AND INVITEES' SOLE AND EXCLUSIVE RISK AND PURCHASER HEREBY WAIVES ANY AND ALL CLAIMS FOR PERSONAL INJURY OR PROPERTY DAMAGE INCURRED BY PURCHASER, ON OR ABOUT THE UNIT OR CONSTRUCTION SITE WHETHER CAUSED BY SELLER, ITS REPRESENTATIVES OR PERSONNEL. PURCHASER FURTHER COVENANTS AND AGREES TO INDEMNIFY, DEFEND AND SAVE SELLER AND ITS REPRESENTATIVES AND PERSONNEL HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS FOR PERSONAL INJURY OR PROPERTY DAMAGE BROUGHT BY PURCHASER, OR ITS AGENTS, GUESTS, CONTRACTORS, INSPECTORS OR INVITEES.** Unauthorized access to the Unit or Construction Site shall be considered a trespass which may, at the election of Seller, be considered a material breach of this Agreement, and in addition to any other remedies available to Seller, Seller may declare this Agreement void, and, in such event, the Deposit herein provided, plus any amounts paid on account for Options, may be retained by Seller as fixed liquidated damages.





_____/_____ [Purchaser's initials]

24.2  Purchaser shall have three (3) opportunities to view the Unit prior to Settlement: (1) at the orientation walkthrough to be scheduled by Seller prior to completion of the Unit, (2) at the pre-settlement inspection as set forth in Paragraph 9 herein upon substantial completion of the Unit, and (3) if necessary, one follow-up visit to the Unit following the pre-settlement inspection, but prior to Settlement on the Unit.  Purchaser hereby acknowledges that no other access or entry into the Unit will be granted to Purchaser other than as set forth under this Paragraph 24.2.  Purchaser has read this Paragraph 24.2 and agrees to adhere to the terms of Paragraph 24 hereof.

_____/_____ [Purchaser's initials]

25 . PURCHASER'S RIGHT TO CANCEL.

25.1.  Seller hereby grants to Purchaser a period of fifteen (15 ) days within which to review the Public Offering Statement made available to Purchaser pursuant to the Condominium Act and applicable regulations.  Notwithstanding any other provision of this Agreement to the contrary,  Purchaser, at his or her election, by written notice to the Seller or Seller's agent, sent by registered mail (or personal delivery to the Seller's or Seller's agent's office during business hours) at any time prior to midnight local time of the fifteenth (15th) day following the Effective Date, or receipt by Purchaser of a current Public Offering Statement, whichever is later, may terminate this Agreement, and thereupon the Purchaser's entire Deposit shall be refunded and the parties hereto shall have no further rights or liabilities under this Agreement.

25.2  PURCHASER'S RIGHT TO CANCEL [Spanish equivalent]

El vendedor permitira al comprado un periodo de 15 dias para revisar los documentos refderente a las leyes y regulaciones in el Distrito de Columbia.  No obstante cualquier otra provision de este acuerdo, el comprador, podra a su eleccion, responder al vendedor por medio de una carta registrada (o entregarlo personal mente a la oficina del vendedor durantre las horas del trabjo) en ecualquer momento antes de la medianoche del decimoquinto dia que sigue la fecha senalada en el contrato firmado por el comprado, o, que el comprado haya recibido un Anuncio de Oferta Publica corriente, lo que suceda ultimanmente, podra terminar el acuerdo, el comprador recibira su deposito y no habra ninguana obligacion entre las personas dentro de esta acuerdo.

25.3  If Purchaser terminates this Agreement pursuant to Paragraph 25 herein,

Purchaser shall return to Seller all copies of the Public Offering Statement and exhibits thereto, or pay to Seller the sum of $50.00 at such time, and the parties hereto shall execute a release of this Agreement.

26. AGENCY.    CHECK IF APPLICABLE ☐

The Seller agrees to pay to Purchaser's real estate salesperson (the "Agent") (if applicable), a commission in the amount as outlined in the "PN Hoffman Sales and Design Center Broker Registration" (the "Registration Form") attached as Exhibit D hereto, and distributed in accordance with the terms and conditions as set forth therein. At Settlement on the Unit, said commission is hereby assigned to the Broker as set forth on the Registration Form out of the proceeds of the sale of the Unit, and the settlement company is hereby authorized and directed to deduct the aforesaid commission from the proceeds of the sale and to make payment thereof directly to the Broker in accordance with a fully executed Registration Form. In the event that that an Agent or Broker is not identified in the Registration Form, or the Registration Form is not fully executed, Purchaser shall indemnify Seller against the claim of any other broker, salesperson or sales agent claiming through Purchaser, including any attorney's fees incurred as a result of such claim. In the event that Settlement on the Unit does not occur for any reason, Agent shall not be entitled to any commission and Purchaser shall indemnify Seller against any claim that the Agent may have to such commission, including attorney's fees incurred as a result of such claim.

27. PRIMARY RESIDENCE.

PURCHASER HEREBY REPRESENTS AND WARRANTS THAT PURCHASER INTENDS TO OCCUPY THE CONDOMINIUM UNIT AS A PRIMARY RESIDENCE. ANY MISREPRESENTATION REGARDING PURCHASER'S INTENTION TO RESIDE IN THE CONDOMINIUM UNIT SHALL CONSTITUTE A DEFAULT BY PURCHASER PURSUANT TO PARAGRAPH 12 OF THIS AGREEMENT AND SHALL RESULT IN THE TERMINATION OF THIS AGREEMENT AND THE FORFEITURE OF PURCHASER'S DEPOSIT.

_____ [Purchaser's initials]

28. ARBITRATION.

ANY DISPUTE, CONTROVERSY, OR CLAIM CONCERNING THE RIGHTS OR OBLIGATIONS OF THE PARTIES, INCLUDING, WITHOUT LIMITATION, ANY CONDITION OR ELEMENT OF THE UNIT, NEIGHBORHOOD OR NEARBY PROPERTY; THE NEED OR EFFECTIVENESS OF ANY REPAIR OR REPLACEMENT UNDER THE

20

LIMITED WARRANTY; OR ANY CLAIM OR MISREPRESENTATION, FRAUD, OR BREACH OF THIS AGREEMENT, SHALL BE SUBMITTED TO AND SETTLED BY BINDING ARBITRATION PURSUANT TO THE FEDERAL ARBITRATION ACT, TITLE 9 U.S.C. SELLER AND PURCHASER AGREE THAT SUCH ARBITRATION SHALL BE MANDATORY AND BINDING AND SHALL BE IN LIEU OF ANY OTHER LEGAL PROCESS OR REMEDY. ARBITRATION MAY BE REQUESTED BY EITHER PARTY AND SHALL BE CONDUCTED BY THE AMERICAN ARBITRATION ASSOCIATION ACCORDING TO ITS COMMERCIAL RULES. THE ARBITRATION SHALL AWARD ATTORNEY'S FEES, EXPERT WITNESS FEES, AND REASONABLE COSTS TO THE PARTY WHOSE POSITION IS UPHELD BY THE ARBITRATOR. SHOULD PURCHASER, IN VIOLATION OF THIS PARAGRAPH 28, COMMENCE LEGAL ACTION IN A COURT, SELLER SHALL HAVE THE RIGHT TO HAVE SUCH LEGAL ACTION DISMISSED AND TO RECOVER THE COST OF OBTAINING THE DISMISSAL. FURTHER, THE FILING OF ANY LEGAL ACTION IN VIOLATION OF THIS PARAGRAPH 28 SHALL NOT SERVE TO TOLL ANY STATUTE OF LIMITATIONS OR TIME PROVISION SET FORTH IN THIS AGREEMENT, THE LIMITED WARRANTY OR APPLICABLE LAW.

29.    MISCELLANEOUS.

The invalidity of any provision of this Agreement shall not affect the validity or enforceability of any other provision of this Agreement. This Agreement and the rights and obligations of the parties hereunder shall be construed in accordance with the laws of the District of Columbia. With respect to the Condominium and abutting properties, Seller makes no representations, oral or written, concerning future land use and reserves the right to change or discontinue unit sales, models, or any portion of the property intended for the Condominium, or alter easements areas at any time without notice. Any checks accepted by Seller shall be subject to collection and payment. Seller has designated PN Hoffman, Inc., as its authorized sales representative, for the sale of units within the Condominium.

30.    ENVIRONMENTAL FACTORS.

30.1.    Seller makes no warranty, either express or implied, regarding the presence or absence of radon gas, asbestos, mold, lead in water, or any other hazardous substance or contaminant (collectively, "Environmental Materials"), in, at or in the vicinity of the Condominium or the Unit(s). Purchaser acknowledges that Seller shall not be liable for any damages related to the presence of any Environmental Materials in, at or in the vicinity of the Condominium or the Unit(s). By closing upon the Unit(s), Purchaser will be deemed to have released Seller from any and all claims and liabilities relating to or arising from the presence of Environmental Materials in, at or in the vicinity of the Condominium or the Unit(s), and from any and all responsibility for mitigating or remediating any Environmental Materials that may be

21

discovered in, at or in the vicinity of the Condominium or the Unit(s). Purchasers acknowledges that water supplied to the Condominium is provided by the DC Water and Sewer Authority (DCWASA), and that published reports have revealed the presence of lead in certain samples of drinking water supplied by DCWASA. Information on water supplied by DCWASA may be obtained from DCWASA, the District of Columbia Department of Health, the U.S. Environmental Protection Agency, and the U.S. Army Corps Washington Aqueduct. Purchaser acknowledges that Seller shall not be liable for any damages related to the condition of water in the Condominium or the Unit(s), including but not limited to the presence of lead in the water. This provision shall survive Settlement.

30.2    Mold, dust mites and pet dander are all naturally occurring substances that are all around us, in places that include work environments, outdoors, restaurants, and in the Purchaser's Condominium Unit. Seller and its employees are not experts on this topic, particularly with respect to mold, and to Seller's knowledge, medical, health science and building science professionals have not formed a consensus with respect to the effects of exposure to mold and similar substances. Because this topic is one for which Purchaser may have questions, Seller desires to provide to Purchaser some basic information gleaned from publicly available sources on the subject as well as the addresses of some websites where Purchaser can review such information in more depth. THE FOLLOWING IS NOT INTENDED TO BE A COMPREHENSIVE DISCUSSION OF THIS TOPIC AND IS BASED UPON DOCUMENTS FROM VARIOUS PUBLIC SOURCES. SELLER DOES NOT WARRANT THE ACCURACY OF THE INFORMATION HEREINBELOW PROVIDED.

(a) Molds are organisms found almost everywhere. Their growth requires a combination of moisture, an appropriate temperature, between 40° - 100° Fahrenheit and a food source such as paper, dirt, wood or leaves. Molds can be highly beneficial, benign and in some cases, with certain individuals, may give rise to concern of possible health effects, though there are presently no medical standards for exposure to molds. It is the Purchaser's responsibility to determine whether Purchaser or a member of Purchaser's household may have sensitivities to mold. Purchaser shall be solely responsible for monitoring Purchaser's Condominium Unit for possible contaminants such as mold.

(b) Mold naturally occurs in any indoor environment. The U.S. Environmental Protection Agency's Air Quality Website, "Mold Resources," states that, "There is no practical way to eliminate all mold and mold spores in the indoor environment; the way to control indoor mold growth is to control "moisture." Mold can enter a condominium unit through doors, windows, people, pets and HVAC systems. As such, it is not possible to prevent mold from entering Purchaser's Unit.



(c)  Governmental and non-governmental organizations have made suggestions of steps individuals, such as Purchaser, can take to control the potential for the growth of mold and other indoor contaminants in Purchaser's Condominium Unit.  The following are merely suggestions and do not constitute an all-inclusive list:

(i) Use air conditioners and dehumidifiers properly, and clean and empty the dehumidifiers daily;

(ii) Vacuum and clean regularly, using a mold-killing product in bathrooms;

(iii) Check the seal around the doors of Purchaser's refrigerator and freezer to make sure they are sealed properly and follow the manufacturer's procedures to clean the drip pans;

(iv) Address any leaks immediately; and

(v) Take immediate action if Purchaser detects signs of moisture or mold. Moisture should be immediately dried to prevent mold growth and Purchaser should clean any mold growth by washing off hard surfaces with detergent and water followed by complete drying of the surface.  Mold not promptly and property addressed may reoccur and/or spread.

(d)  The following websites are just a few of the many available to Purchaser where additional information can be obtained:

US Environmental Protection Agency – http://www.epa.gov
Centers for Disease Control and Prevention – http://www.cdc.gov

(e)  In the event that moisture arises from a cause covered under the statutory condominium warranty (the "Warranty"), Purchaser MUST IMMEDIATELY contact Seller so that appropriate investigation and action can be taken.  If the warranty period has lapsed or the Warranty does not cover the item(s), then Purchaser should take immediate action to have the problem addressed.  Seller shall not be responsible for, and Purchaser expressly agrees to indemnify and hold Seller harmless from, any water/moisture related damages, including but not limited to personal injury or property damage caused by mold to the extent these damages:

(i) are caused by Purchaser's negligence;

(ii) are caused or made worse by Purchaser's failure to immediately take necessary remedial actions and minimize damage caused by the water/moisture; or

23



(iii) are caused by Purchaser's failure to immediately notify Seller of a water/moisture problem potentially covered under the Limited Warranty and Purchaser not permitting Seller access to the Purchaser's Unit to address the problem and take the remediation steps deemed necessary, if any, by Seller in its sole discretion.

(f) PURCHASER ACKNOWLEDGES THAT PURCHASER HAS RECEIVED, READ AND UNDERSTANDS THE INFORMATION, WAIVERS AND RECOMMENDATIONS IN THIS PARAGRAPH 30.2.

31. REPURCHASE RIGHT.

31.1    Purchaser hereby represents to Seller that Purchaser is purchasing the Unit as his/her primary, year round residence and does not intend to sell the Unit for a period of at least twelve (12) months from the date of Settlement. In order to induce Seller to sell the Unit to Purchaser, Purchaser agrees that the deed of conveyance from Seller conveying the Unit to Purchaser may, at the sole and exclusive option of Seller, contain an express reservation in favor of the Seller (the "Repurchase Reservation") reserving unto the Seller the right, but not the obligation, to repurchase from the Purchaser the Unit on the terms and conditions set forth below in the event that Purchaser shall attempt to sell the Unit during the period that is twelve (12) months from the Settlement (the "Repurchase Period").

In the event that Purchaser wishes to convey the Unit during the Repurchase Period, the Purchaser shall be obligated first to notify Seller in writing and Seller shall for a period of fifteen (15) days following its receipt of such written notice have the right (but not the obligation) to repurchase from the Purchaser the Unit at the same purchase price paid by Purchaser pursuant to this Purchase Agreement (the "Repurchase Right"). In the event Seller shall exercise its Repurchase Right, Seller shall thereafter be obligated to proceed to closing on the Unit within thirty (30) days following notification to Purchaser by the Seller of its exercise of the Repurchase Right. Should Seller exercise its Repurchase Right, Purchaser shall be obligated to convey to Declarant good and marketable title by special warranty deed and free of liens and encumbrances, and subject only to those title matters as to which Purchaser took subject to on the date of Settlement. The Unit shall also be vacant at the time of settlement, and substantially in the same physical condition as when delivered to Purchaser at Settlement. The Seller shall be obligated to pay for all recording costs and other settlement costs in connection with its repurchase of the Unit, provided Purchaser shall pay the District of Columbia Transfer Tax (1.1% as the Effective Date). Closing on the repurchase shall occur at the office of a title insurance company designated in writing by Seller. Real estate taxes and Condominium assessments shall be adjusted and prorated to the date of the settlement on the repurchase. If Seller elects not to exercise its Repurchase Right or fails to exercise its Repurchase Right within

24



the time frame specified in this Paragraph, Purchaser shall be free to convey the Unit to a third party. Notwithstanding anything to the contrary contained in the Purchase Agreement, the provisions of this Paragraph 31 shall survive Settlement, and the Repurchase Right may be specifically set forth in the deed of conveyance for the Unit.

The Repurchase Right shall be subordinate to the rights of any bona fide lending institution making a first deed of trust loan secured by the Unit to Purchaser hereunder and any such deed of trust lender shall take title free of all rights of repurchase in favor of Seller in the event of any foreclosure or deed in lieu of foreclosure.

[SIGNATURE PAGE TO FOLLOW.]

25



IN WITNESS WHEREOF, the parties have executed this Agreement this __11__ day of __MAY__, 2005.

Purchaser's Address:

_851 N. GLEBE RD #1521_
_ARLINGTON, VA, 22203_

PURCHASER(s):

_____
(Purchaser's Signature)

Date: _5 - 11 - 05_

Telephone No. _703 - 243 - 2254_      _703 - 593 - 6313_
　　　　　　Home　　　　　　　　　Office

Email address: _OmidroKni@yahoo.com_

SELLER:

PNH UNION SQUARE L.L.C.,
a Delaware limited liability company

By: _____ _5|13|05_
　　　　　PN Hoffman Realty, Inc.,
　　　　　Authorized Agent

**NOTWITHSTANDING THE DELIVERY OF A DEPOSIT, AND SELLER'S SALES REPRESENTATIVES ACKNOWLEDGING WRITTEN RECEIPT THEREOF, THIS AGREEMENT IS NOT BINDING UPON SELLER UNTIL ACCEPTED IN WRITING BY SELLER.**

26

## RECEIPT OF PUBLIC OFFERING STATEMENT

The undersigned acknowledge(s) that I (we) have received a Public Offering Statement for THE FLATS AT UNION ROW CONDOMINIUM, 2125 14th Street, N.W., Washington, D.C. 20005.

Date: _5 - 11 - 05_

_____
Purchaser

27

